Marks Flynn BRYANT, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–95–188–CR.

Court of Appeals of Texas,
Waco.

May 22, 1996.

Michael B. Roberts, Waco, for appellant.

John W. Segrest, Criminal District Attorney, Wayne Coughran, Asst. District Attorney, Waco, for appellee.

Before CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Marks Flynn Bryant appeals a conviction of the misdemeanor offense of resisting arrest for which a jury assessed punishment at 180 days in the McLennan County Jail. TEX. PENAL CODE ANN. § 38.03 (Vernon 1994). Bryant brings six points on appeal. In point one, he contends that the State's evidence is insufficient to prove that he resisted arrest. In point two, he asserts that the court erred in overruling his *Batson*[1] challenge. Finally, in points three through six, he complains that the court erred by overruling his objections to the State's improper jury arguments. We will affirm the judgment.

### FACTUAL BACKGROUND

On October 29, 1994, Marks' wife, Paula Mae Bryant, made a written complaint against Marks at the Bellmead Police Department for family violence. Because the offense was alleged to have occurred at the

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Bryant home just outside the Bellmead city limits, the Bellmead Police Department referred Paula's complaint to the McLennan County Sheriff's Department. As a result, Patrol Sergeant Kenneth Vanek and Deputy Miley Hudson of the Sheriff's Department were dispatched to the Bellmead Police Department to meet with Paula.

According to Sergeant Vanek, Paula appeared to be upset, scared, suffering from pain of bodily injuries, and concerned about the safety of her children back at her residence. Consequently, Sergeant Vanek and Deputy Hudson drove to the residence in their patrol car, followed by Paula and her sister in another vehicle. Sergeant Vanek parked in the driveway, while Paula parked on the street directly in front of the house.

After Sergeant Vanek knocked on the front door, Marks "came from around behind the house" to meet them on the front porch. Sergeant Vanek identified himself to Marks, explaining that he was with the Sheriff's Department and was investigating a family violence assault. Both officers were wearing clearly distinctive uniforms and insignia establishing their office.

According to Sergeant Vanek, Marks was perspiring, his breath smelled of alcohol, his speech was slightly slurred, and he appeared to be "agitated" and "excited." Deputy Hudson described Marks as "very excited" and testified that Marks was "sweating profusely" and appeared to be "somewhat chemically impaired." When Marks approached the officers, he immediately started "rambling and talking excitedly" about how their presence at his home was unnecessary. After listening to Marks for several minutes, Sergeant Vanek decided to place him under arrest. According to Deputy Hudson, Sergeant Vanek then told Marks:

> Well, Mr. Bryant, we have a complaint against you for family violence. I'm going to have to arrest you and take you to jail.... If you will turn around and face the wall [and] place your hands behind you, we'll have to handcuff you and take you to jail.

As Sergeant Vanek attempted to handcuff Marks, a struggle ensued for about "10 to 12 seconds." The officers eventually subdued Marks, handcuffed his wrists, and placed him in the patrol car. In the interest of preserving an accurate description of the struggle, we set out, in part, the testimony describing the event:

SERGEANT VANEK—DIRECT EXAMINATION BY STATE

Q And when you told him that he was going to be handcuffed, then what did you do?

A I took hold of his right arm, about the wrist area.

Q Okay. Where were you standing at this time when you took ahold of his arm?

A I was standing on the porch, standing to his right side.

Q Where was Deputy Hudson standing?

A He was standing, I believe, on the edge of the steps, more or less on Mr. Bryant's left side.

. . . . . .

Q Was he cooperating with you when you were attempting to, to arrest him at that time?

A No.

Q Did he give you any type of impression that he did not want to be arrested at that time?

A He resisted me when I was attempting to handcuff him. He resisted and tried to pull away from me.

. . . . .

Q Okay. On this particular occasion when you took his hand, what did he do?

A He stiffened up, jerked back like that.

Q And what did you do?

A Well, I just kept pressure holding his arms, trying to pull it back. And in that motion, he was coming around like this, toward me.

Q Okay. When he stiffened up and raised his hand, did his hand ever come close to your face?

. . . . .

A Okay. As he threw his arms like this, he come close to hitting me in the face.

. . . . .

Q How would you characterize the, the motion or movement of when you put your hand on the defendant and then his subsequent action?

A Well, I took hold of his wrist and just attempted to bring it around behind his back, to handcuff him, and at that point he tried to jerk away from me. And we, in this same motion, we—our, went off the porch.

. . . . .

Q As far as his jerking away movement, how would you characterize this movement?

A He jerked the arm, his right arm, I had ahold of, he attempted to jerk away from my hold, and in doing so, he swung his body around in an attempt, more or less, to face me head-on; and at that point in time I reached and grabbed him around the neck to gain better control of him.

. . . . .

Q When you put your arm around him, can you describe—or tell the members of the jury the reason for grabbing him around, I guess, the neck area or chest area.

A To get better control of him. I couldn't get ahold of his left arm, as it was away from me, and I wanted to keep him away from my gun side. So that was about the only position I could take hold of him to try to control him.

Q Were you having a hard time controlling him?

A Yes, I was.

Q Any particular reason for that?

A Well, he was very sweaty. His skin was very slick, and he, he was—as if he was trying to escape. He was trying to get off the porch, and, in fact, as he was going down off the porch, he stumbled, and we fell onto the ground.

Q Do you recall what Deputy Hudson was doing at this time, or could you tell?

A Yeah. He was trying to get control of his left arm and cuff his left arm.

Q After you fell to the ground, what happened—were you on the ground, also, with Mr. Bryant at this time?

A Yes, I was.

Q Did you ever let go of that wrist?

A No.

Q Did you have any fear of letting go of that wrist?

A Oh, yes.

Q What were your concerns?

A Well, I was concerned that he could injure me or could possibly gain control of a weapon.

Q And did you, once you went to the ground, did you attempt any further efforts at getting that right arm cuffed?

A Yes. I was still trying to bring his right arm around him, and he still had it stiff up under him. We were laying—he was laying face down on the ground as I was on top of him, and he still had his arm in a stiff manner underneath him.

Q You could feel the arm being stiffened?

A Yes.

. . . . .

Q Sergeant Vanek, when you had the defendant there on the ground and his right arm was stiffened up and you were trying to put the cuff on it, and I believe you testified that Officer Hudson had the left arm and may have gotten the cuff on it, the defendant made a statement.

A Yes, he did.

Q And what did he tell you?

A He said, "Okay, I give up. I'll let you cuff me now."

SERGEANT VANEK—CROSS EXAMINATION BY MARKS

Q Now, within the context of [your written report], you have made a very simple statement, I believe—and you correct me if I'm wrong—that the defendant simply resisted to the extent—why don't you refer to your report?

You say that he resisted—he resisted—

A Okay. Said "He tried to break from me and resisted to the degree that myself and Officer Hudson had to force him to the ground to finally be able to restrain him enough to place the cuffs on him."

. . . . .

Q And that was in response to his raising his arm or pulling his arm away from you?

A That was not the—I did not attempt to force him to the ground to gain control of him. As I had ahold of his right arm and he went to pull away from me, I put my left arm around his neck. And at that point, he was in a forward motion, at which time carried myself and him off of the porch, and we could not maintain our balance and we fell to the ground.

DEPUTY HUDSON—DIRECT EXAMINATION BY STATE

Q Do you recall the defendant ever making any moves?

A At that time, you know, at the time that the sergeant placed his hand on there and started to turn him towards the wall, the defendant twisted, swung around, and you know, his elbow came back to the sergeant like that. And the spinning motion carried him around to facing me to where his left elbow came towards me. I grabbed for his left arm, and my hand slipped off his arm at that time. Do you want me to go on?

Q Sure. Go right ahead.

A As he spun around—the sergeant, with his hand on his right bicep, you know—spun around—the sergeant reached around him to get control of him. Like I say, I was over here. My hand slipped off his arm, this spinning motion carried him off the porch, and they stumbled at this time, falling towards the ground.

Well, I was just right in behind him, reaching for that left arm that I had lost control of. They fell to the ground with the sergeant basically on top of the defendant, you know, and—

. . . . .

Q Could you see any reason for this action of the defendant, his twisting and pulling?

. . . . .

A Well, the defendant apparently just did not want to be arrested and was trying to, you know, do whatever he could to break free and prevent us from handcuffing him.

. . . . .

Q As far as the, the action that the defendant took right after being told he was going to be handcuffed, how would you characterize his move?

A Well, I, I would call it a rather violent backward swing, you know, to maybe knock the sergeant's hand loose or whatever.

. . . . .

Q After going to the ground with the defendant, you were working with his left arm?

A Yes. This is more or less as they fell to the ground, I was right behind, grabbed his left arm with my right hand, reached back, pulled my cuff, pulled his arm around and cuffed it. This all happened probably in 10 seconds, once the initial contact was made, you know, and the sergeant said, "You are under arrest," you know. This whole scuffle probably took 10 seconds, maximum.

. . . . .

Q From what you saw out there, who caused the defendant and Sergeant Vanek to go off the porch?

A Well, the defendant caused it, himself, by his violent reaction and twisting motion, his resisting motion.

DEPUTY HUDSON—CROSS EXAMINATION BY MARKS

Q Now, did you not testify that Mr. Vanek took the defendant's arm and spun him around?

A No, sir. I believe the spinning motion was caused by the defendant, himself, in his violent motion back with his elbow like this to try to jerk, I would say trying to jerk free from the sergeant's grasp, you know. The defendant was responsible for the violent twisting motion that we were talking about.

## SUFFICIENCY OF THE EVIDENCE

In point one, Marks complains that the State's evidence was insufficient to support a conviction of resisting arrest. Evidence will sustain a conviction if, viewing it in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Crim.App.1993). Under the *Jackson* standard, we do not position ourselves as a thirteenth juror in assessing the evidence; rather, we position ourselves as a final, due-process safeguard ensuring only the rationality of the factfinder. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim. App.1988). We have only the discretion to determine if any rational trier of fact, considering the evidence admitted at trial, could have found the essential elements of the offense beyond a reasonable doubt. *Id.* We do not make our own myopic determination of guilt from reading the cold record and do not disregard, realign, or weigh evidence. *Id.*

Marks contends that there is no evidence that he used "force against the peace officer," an essential element of resisting arrest. TEX. PENAL CODE ANN. § 38.03(a) (Vernon 1994). Section 38.03(a) of the Penal Code provides that:

(a) A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another *by using force against the peace officer* or another.

*Id.* (emphasis added).

Marks argues that he did not direct any violence toward the arresting officers. Instead, he characterizes his actions as "evasive" and describes his struggle with the officers as "an attempted withdrawal of his arm from Sergeant Vanek's grasp," "an attempt . . . to extricate himself from Sergeant Vanek's grasp," and "[m]erely pulling away." According to Marks, merely trying to flee or shake off an officer's detaining grip does not amount to sufficient force directed at a peace officer to sustain a conviction for resisting arrest. In support of this argument, Marks points to the decisions in *Raymond v. State*, 640 S.W.2d 678 (Tex.App.—El Paso 1982, pet. ref'd), and *Leos v. State*, 880 S.W.2d 180 (Tex.App.—Corpus Christi 1994, no writ).

In *Raymond*, the court considered whether the act of pulling one's arm out of a peace officer's grasp constituted "using force against the peace officer." *Raymond*, 640 S.W.2d at 679. The court concluded that it does not, reasoning:

The very language of Section 38.03 indicates that the required force must be directed at the officer or applied to him. Appellant appropriately points to the Practice Commentary to Section 38.03:

One who runs away or makes an effort to shake off the officer's detaining grip may be guilty of evading arrest under Section 38.04, but he is not responsible under this section.

The Practice Commentary has been cited by the Court of Criminal Appeals with apparent approval.

. . . . .

Striking an arresting officer's arm away constitutes force directed against the officer. This is distinctly different from the direction of force employed in simply pulling one's arm away. There is no danger of injury to the officer in the latter action.

*Id.* (citations omitted).

In *Leos*, the defendant crawled on his shoulders and knees with his hands clasped to his stomach in an attempt to frustrate a peace officer's efforts to shackle him. *Leos*,

880 S.W.2d at 181. The court held that such an attempt was an insufficient showing of force directed at an officer to sustain a conviction of resisting arrest. *Id.* at 184. The court explained:

> The idea of violence directed specifically toward Officer Landrum conflicts with this image of appellant crawling on his shoulders and knees with his hands clasped to his stomach. By attempting to crawl away, appellant invited prosecution for evading arrest. Merely trying to flee does not, however, involve sufficient force directed at the peace officer to sustain a conviction for resisting arrest. Nor is the peace officer the object of any force expended in shaking off a detaining grip, which implies no less force than refusing to submit to the handcuffs.

*Id.* (citations omitted).

We do not follow the El Paso and Corpus Christi Courts of Appeals' liberal interpretation of Section 38.03 and the 1973 "Practice Commentary" which followed it. Both courts quote the following portion of that commentary: "One who runs away or makes an effort to shake off the officer's detaining grip may be guilty of evading arrest under Section 38.04, but he is not responsible under this section." TEX. PENAL CODE ANN. § 38.03 (Seth S. Searcy III & James R. Patterson, Practice Commentary) (Vernon 1974). We disagree with the courts' decisions in *Leos* and *Raymond* to the extent that they hold that *any* effort to shake off an officer's detaining grip by "simply pulling one's arm away" is not sufficient force to sustain a conviction for resisting arrest. *Leos,* 880 S.W.2d at 184; *Raymond,* 640 S.W.2d at 679. According to the El Paso court in *Raymond,* "There is no danger of injury to the officer" in such an action. *Raymond,* 640 S.W.2d at 679. The court goes on to say, "Where violence *toward* the officer is present, Section 38.03 applies, ... [but,] [w]here violent force is not directed at the arresting officer, the circumstances are not exigent." *Id.*

 Section 38.03 prohibits the use of "force *against* [a] peace officer or another,"

not the use of force *toward* a peace officer. TEX. PENAL CODE ANN. § 38.03 (emphasis added). There is a distinct difference between the two. Webster's defines *against* as "in opposition to or hostility to," and *toward* as "in the direction of." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 21, 1248 (10th ed.1993). Thus, pulling one's arm in an attempt to shake off an officer's detaining grip *could* amount to force *against* that officer.[2]

 In *Raymond* and *Leos,* both courts chose to omit the topic sentence of the paragraph they quote from the 1973 Practice Commentary to Section 38.03. TEX. PENAL CODE ANN. § 38.03 (Practice Commentary). The *entire* paragraph reads:

> *The section applies only to resistance by the use of force.* One who runs away or makes an effort to shake off the officer's detaining grip may be guilty of evading arrest under Section 38.04, but he is not responsible under this section. Unlike prior law, this section covers an arrest or search with *and* without a warrant.

*Id.* (first emphasis added). In the context of the topic sentence, the paragraph implies that one who runs away or makes an effort to shake off an officer's detaining grip *without the use of force* may be guilty of evading arrest under Section 38.04, but he is not responsible under Section 38.03. In an interpretation of Section 38.04, the Court of Criminal Appeals reinforces the distinction between the use of force and the lack of force when comparing Sections 38.03 and 38.04:

> [Section] 38.04 of the Penal Code ... was obviously designed to apply where there has been a *non-forceful evasion* of arrest under the circumstances to which neither § 38.03 (resisting arrest) nor § 38.07 (escape) is applicable.... The section's intent is to deter flight from arrest by the threat of an additional penalty, thus discouraging forceful conflicts between the police and suspects.
>
> [Section] 38.04 is general in nature in that it applies to all types of *non-forceful evasion* of arrest.

**2.** For example, if an incredibly strong suspect "simply pull[ed] his] arm away" from an officer who did not release his grip, the officer could potentially fall over the side of a tall building or fly through a plate glass window.

*Alejos v. State,* 555 S.W.2d 444, 449 (Tex. Crim.App.1977) (emphasis added). Thus, "[o]ne who runs away or makes an effort to shake off the officer's detaining grip may be guilty of evading arrest under Section 38.04, [and] not responsible under [Section 38.03]," but only if there has been a *non-forceful* evasion of arrest. TEX. PENAL CODE ANN. § 38.03 (Practice Commentary). It follows that one who uses force to shake off an officer's detaining grip, whether by pushing or pulling, may be guilty of resisting arrest under Section 38.03.

Notwithstanding the above, the facts of the present case are distinguishable from the facts in *Raymond* and *Leos. Leos,* 880 S.W.2d at 184; *Raymond,* 640 S.W.2d at 679. The facts of this case show that when Sergeant Vanek told Marks he was under arrest and "took hold of his right arm about the wrist area," Marks "stiffened up" and then "jerked back" with a "rather violent backward swing" of his hand, "com[ing] close to hitting [Sergeant Vanek] in the face." Marks then "swung his body around in an attempt ... to face [Sergeant Vanek] head-on" at which time Sergeant Vanek "grabbed him around the neck to gain better control of him." Marks "was in a forward motion" and carried Sergeant Vanek and himself off the raised porch and caused them both to fall to the ground. While on the ground, he held his arm "in a stiff manner underneath him" to prevent being handcuffed. Finally, Marks said, "Okay, I give up. I'll let you cuff me now."

Such activity goes beyond "simply pulling one's arm away." *Raymond,* 640 S.W.2d at 679. We conclude that, when viewed in the light most favorable to the verdict, the above evidence is sufficient to support a conviction for resisting arrest; *i.e.,* any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89, 61 L.Ed.2d 560; *Turro,* 867 S.W.2d at 47. We overrule point one.

**3.** Marks does not complain about the State's use of a peremptory strike against veniremember Number 13, the other black male veniremember, because Number 13 admitted that he had known

## *BATSON* CHALLENGE

In point two, Marks asserts that the court erred in overruling his *Batson* challenge concerning the State's peremptory strike against veniremember Number 6, a black male. Marks points out that he is black, and that the State exercised two of its three peremptory challenges against two of the four black veniremembers on a panel of fifteen considered in selecting a jury of six. According to Marks, the State's exclusion of veniremember Number 6 was "racially motivated," "discriminatory," and "systematic." [3]

■■■■ It is constitutionally impermissible to exercise peremptory strikes on the basis of race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). To raise a *Batson* challenge, the opponent of a peremptory strike must make a prima facie showing of the proponent's discriminatory use of the strike. *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834, 839 (1995); *Emerson v. State,* 851 S.W.2d 269, 273 (Tex.Crim.App.1993). Once the opponent makes a prima facie showing, the proponent of the strike has the burden to produce a race-neutral explanation for the strike. *Purkett,* —— at —— – ——, 115 S.Ct. at 1770–71, 131 L.Ed.2d at 839. If a race-neutral explanation is given, the opponent of the strike must prove purposeful racial discrimination. *Id.* The burden of persuasion regarding racial motivation never leaves the opponent of the strike; therefore, the race-neutral explanation given by the proponent of the strike is not required to be persuasive, but merely facially valid. *Id.*

■■■■ A trial court's finding that peremptory strikes were not racially motivated will be upheld on appeal so long as the finding is not "clearly erroneous." *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex.Crim.App. 1989). In determining whether the trial court's decision is "clearly erroneous," we must review the record and decide if we are left with a firm and definite conviction that a mistake has been made. *Hill v. State,* 827 S.W.2d 860, 865 (Tex.Crim.App.) (quoting

Marks' family for approximately twenty years and would have had a difficult time returning a verdict against him.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), *cert. denied*, 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). In doing so, we view the evidence in the light most favorable to the trial court's rulings. *Id.*

▮▮▮ We first consider whether the State met its burden of producing a race-neutral explanation for its strike against veniremember Number 6.[4] A race-neutral explanation is one based on something other than the race of the venireperson. *Chambers v. State*, 866 S.W.2d 9, 24 n. 16 (Tex. Crim.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). "At this step of the inquiry, the issue is one of facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)). The State indicated that Number 6 was stricken because:

> [H]e [did] not understand a lot of my questions. I had to repeat them several times. He seemed to be somewhat hesitant in responding to some very crucial questions. The most important that comes to mind is[, "I]f an individual were to be arrested for . . . an assault case or domestic violence and the victim were to want to drop charges, would that affect their deliberations, as far as a resisting arrest case?["] He seemed to be quite hesitant in his responses, he did not give me an unequivocal response on that.
>
> He also had earrings in each ear. He is a male juror. I personally have an aversion to jurors, male, that have earrings in each ear. That indicates to me that they're not mainstream society and that they may be a little bit more liberal than I would care to have as a juror.
>
> Those are the reasons. Also, he was not married. I noticed that he did have one

. . . child. And for the fact that he did have one child and was not married, I was concerned that he may have had a rocky marriage and possibly had problems with his wife and separation or divorce and would be unduly sympathetic to the defendant in this matter.

Having offered an explanation void of any racially discriminatory intent on its face, the State met its burden of articulating a race-neutral explanation for the use of a peremptory strike against veniremember Number 6.

▮▮▮ Next, Marks had to establish purposeful racial discrimination by impeaching or rebutting the State's explanation; *e.g.*, by showing that the explanation was merely a sham or pretext for discrimination. *Williams v. State*, 804 S.W.2d 95, 101–02 (Tex.Crim.App.), *cert. denied*, 501 U.S. 1239, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991). The following types of evidence, among others, can be used to show a sham or pretext:

1. The reasons given are not related to the facts of the case.

2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.

3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck.

4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors.

*Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Crim.App.1988).

In an attempt to show disparate treatment by the State, Marks points out that another veniremember, Number 1, had many of the same characteristics as Number 6, but was not stricken. For example, Number 1 had

---

**4.** We do not consider the issue of whether Marks established a prima facie case of racial discrimination. In this case the prosecutor articulated all of his reasons for the exercise of his challenged peremptory strike, Marks cross-examined him, and the trial judge entered his finding.

Thus, whether Marks established a prima facie case is a moot issue. *Chambers v. State*, 866 S.W.2d 9, 23 (Tex.Crim.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994).

also been employed only eight weeks, was even younger than Number 6, was also single, and had not one, but two children. The only significant difference between the two was the fact that Number 1 was a white female and Number 6 was a black male.

In response, the State explained:

[T]here is a major difference between [veniremember Number 1] and [veniremember Number 6], and that is, [Number 6] is male, and [Number 1] is female. And in this particular case, the defendant is male and ... the alleged victim of the defendant's bad acts that will be coming out in punishment, [is] female. So I was looking for a juror that would possibly be sympathetic to the State's case in that regard.

The State asked the following question to the venire panel, prompting what it called a "hesitant" response from veniremember Number 6:

Would anyone have a problem with an individual being arrested for a particular offense of which a victim may later decide that they don't want to proceed with the charges but for the fact that the defendant may have resisted the arrest and committed a totally different offense from what he was being arrested for, would anyone feel that the fact that the State was no longer proceeding on the original reason that he was being arrested for, would anyone find that, in itself, a reason to find a defendant not guilty of the offense of resisting arrest?

Marks characterized the question as "very verbose, confusing and compound." He later questioned the prosecutor about it during the *Batson* hearing:

[DEFENSE]: Other than having you repeat the question, is there something else that you would point out to the Court to undergird your assertion that there was hesitancy?

[STATE]: I would have to say with the number of times that I had to explain to him the, the question, I would have to indicate to the Court that that, in itself, would show hesitancy. I felt that the answer was quite clear on its face, and his hesitancy to answer the question possibly under a guise of not understanding the question was just a means that he was using to avoid the question.

Marks also questioned the State's motivation to strike veniremember Number 6 because of his earrings:

[DEFENSE]: And, sir, may I ask if you have some expertise in clothing and attire or any reason that you could specify to the Court that the wearing of earrings by a male would make him less than fair and impartial to the State as a juror?

[STATE]: I would have to say I do not have a particular expertise where I could declare myself as an expert, but I would say that the way one grooms themselves and appears in court, and from my experiences in life, the way one grooms themselves and presents themselves in a court of law does have a major bearing of whether or not I would want them as a witness. If this individual were to be of the color of Anglo and had ... two earrings, I, too, would have struck him.

We agree that the State's question to the venire panel about "different offense[s]" was somewhat confusing. However, considering all of the reasons provided by the State, and viewing the record as a whole in the light most favorable to the court's ruling, we are not left with a firm and definite conviction that a mistake has been made. *Hill,* 827 S.W.2d at 865. Thus, we conclude that the court's finding that the State's peremptory strike against veniremember Number 6 was race-neutral is not clearly erroneous. *Id.*

## IMPROPER JURY ARGUMENT

In points three through six, Marks complains that the court erred by overruling his objections to the State's improper jury argument. Proper jury argument falls within one of the following categories: (1) a summary of the evidence; (2) a reasonable deduction from the evidence; (3) an answer to the opponent's argument; or (4) a plea for law enforcement. *Harris v. State*, 827 S.W.2d 949, 963 (Tex.Crim.App.), *cert. denied*, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). In the absence of an objection at trial, improper jury argument is waived. *Id.* An exception exists when the prosecutor's argument is so prejudicial that an instruction to disregard would not have cured the harm. *Id.* For an improper argument to rise to a level mandating reversal, the argument must be "extreme or manifestly improper, or inject new and harmful facts into evidence." *Kinnamon v. State*, 791 S.W.2d 84, 89 (Tex.Crim.App.1990) (quoting *McKay v. State*, 707 S.W.2d 23, 36 (Tex. Crim.App.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986)), *cert. denied*, —— U.S. ——, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994).

In point three, Marks complains that the court erred by overruling his objection to the State's presentation of unsworn testimony "not encompassed by the court's charge" during its closing argument. During its closing argument, the State made the following reference to the Code of Criminal Procedure:

[STATE]: [A]fter [Sergeant Vanek] had told the defendant that he was there to investigate an offense or a charge of family violence assault, he told the defendant, "I am going to have to arrest you for family violence assault."

As you recall, the Penal Code indicates it is the duty and the authority of peace officers, of persons who the peace officer has probable cause to believe—

[DEFENSE]: Your Honor, I'm going to object to his arguing out of the Penal Code in view of the fact that he didn't put the Penal Code in evidence.

THE COURT: Overruled.

[STATE]: The fact—this is not the Penal Code; this is the Code of Criminal Procedure. "Persons—any peace officer may arrest without warrant persons who the peace officer has—"

[DEFENSE]: Your Honor, I'm going to object to this. It's not in the charge of the Court. He's arguing outside of the law of the case.

THE COURT: Okay. Overruled.

[STATE]: "Any peace officer may arrest without warrant persons who the peace officer has probable cause to believe have committed an assault resulting in bodily injury to a member of a person's family or household." This is the duty and the authority of these officers. They were out there to protect this lady right here. Of course, we'll go into her, her later testimony.

Marks argues that "[a] statement by counsel of what purports to be the law when same is not contained in the court's charge is improper argument." *Cook v. State*, 540 S.W.2d 708, 710 (Tex.Crim.App.1976). The State argues that the error, if any, was harmless because it "did not misstate the applicable law and was correct in its application to the facts of the case." Assuming without deciding that error resulted, we proceed to a harm analysis under Rule 81(b)(2). Tex.R.App.P. 81(b)(2); *Orona v. State*, 791 S.W.2d 125, 129–30 (Tex.Crim.App.1990); *Washington v. State*, 822 S.W.2d 110, 117–18 (Tex.App.— Waco 1991), *rev'd on other grounds*, 856 S.W.2d 184 (Tex.Crim.App.1993).

We must reverse for error in overruling an objection to jury argument unless we can say beyond a reasonable doubt that the error did not contribute to the conviction or the punishment assessed. Tex. R.App.P. 81(b)(2). Therefore, it becomes

necessary to look at the evidence adduced at both stages of trial. *See Allridge v. State*, 762 S.W.2d 146, 155 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). The procedure is: isolate the error and all its effects, then ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted. *Harris v. State*, 790 S.W.2d 568, 588 (Tex.Crim.App.1989). In making that determination, we will consider the following six factors: (1) the source of the error; (2) the nature of the error; (3) whether or to what extent the error was emphasized by the state; (4) the probable collateral implications of the error; (5) how much weight a juror would probably place on the error; and (6) whether declaring the error harmless would encourage the state to repeat it with impunity. *Id.* at 587–88. We do not focus on the propriety of the outcome of the trial, but on the integrity of the process that led to conviction and punishment. *Id.* at 587.

Utilizing the *Harris* factors, we hold that, when the comments complained of are viewed in the context of the evidence and the argument of counsel as a whole, the error—if any—was harmless. *See* Tex.R.App.P. 81(b)(2). We overrule point three.

■ In point four, Marks asserts that the court erred by "allowing the State to vouch for its witnesses on a non-testimonial basis, asserting that they will lose their livelihood and face prison if they lie in Court." According to the State, while Marks was on the witness stand, he personally challenged the veracity of Deputy Hudson by accusing him of "blatantly lying." The following occurred during the State's cross-examination of Marks:

[STATE]: Are you saying that either the deputy was mistaken or he's lying to the jury?

[MARKS]: He's blatently [sic] lying.

[STATE]: He's blatently [sic] lying?

[MARKS]: Yes, he is.

The State argued the following in its closing argument:

[STATE]: To believe the defendant's story in its entirety, you know, especially where it's going like that, then you have to believe that two peace officers with almost 35 years of law enforcement experience behind them would come into this courtroom and intentionally give perjured testimony, a felony grade offense, where they could be completely stripped of their peace officer certification, where they could no longer be peace officers. Now, this is only for a little Class A—

[DEFENSE]: Your Honor, I'm going to object to that as being outside of the evidence.

THE COURT: Overruled.

After reviewing the record, we find that Marks attacked the veracity of the State's witnesses, and the State's argument in response was proper. "The fact that a person incurs risks by committing perjury is a matter of common knowledge." *Vasquez v. State*, 830 S.W.2d 829, 831 (Tex.App.—Corpus Christi 1992, pet. ref'd). Consequently, we find no error in allowing the argument and overrule point four.

■ In point five, Marks contends that the court erred by overruling his objection to the State's penalty-phase jury argument, in which the State was allowed to argue "wholly outside of the evidence." The State argued:

[STATE]: First of all, this is the punishment phase of the trial. It's not the mercy phase, it's not the probation phase, so please don't be misunderstood. This is the punishment phase.

The best way to tell what one is going to do in the future is to look back at their past. And you have heard a lot about this man's past. Our law allows you to punish him for the offense of resisting arrest and also take into consideration in your punishment other past criminal acts or acts of misconduct. I'd like to go over a lot of these things.

First of all, we live in a civilized society, and we must have rules of conduct with consequences for flagrant violations of the rights of others. I'm sure you've all read in the newspaper about crime in America or batterers, people who—

[DEFENSE]: Your Honor, I'm going to object to that as being wholly outside of the evidence.

[STATE]: It's a plea for law enforcement, Your Honor.

[DEFENSE]: Your Honor, to invite this jury to relate in any fashion to what they have read in the newspaper in terms of battering or anything of that nature is clearly outside of this record. There's been no evidence of it.

THE COURT: Overruled.

[DEFENSE]: Your Honor, if I could have the additional time for the period of this objection?

THE COURT: At this time I will refuse.

[STATE]: We have rules. People want to do right. We have to do right. Your are on the line right now between right and wrong. We need to send a message from this courtroom. We need to send the proper message.

A review of the record reveals unrefuted evidence that Marks participated in several prior acts of misconduct involving family violence or "battering."

■ A proper plea for law enforcement may take many forms. *Borjan v. State,* 787 S.W.2d 53, 55 (Tex.Crim.App.1990). One is to argue the relationship between the jury's verdict and the deterrence of crime in general. *Id.* Another is to argue that juries should deter specific crimes by their verdict. *Id.* Thus, the State's appeal to the jury that "we must have rules of conduct" in a civilized society and its attempt to focus the jurors' attention on "crime" or "batterers" was a proper plea for law enforcement. We overrule point five.

■ Finally, in point six, Marks complains that the court erred by overruling his objection to the State's punishment-phase argument, in which the State commented that Marks called his twelve-year-old son to testify "as a sympathy play." The State argued:

[STATE]: The defendant wants you to have sympathy for him, and he wants you to believe that he is so concerned about his children and wife. Let me bring your attention to some of the things. He's guilty of upsetting his children by forcefully resisting arrest and causing a scene in front of the children. He failed to restrain himself from beating up their mother. Remember Paula's sworn affidavit for the Protective Order, addressing how fearful the children [were] of him? Remember the 1989 incident, where he tried to snatch the children out of the bathtub over at his wife's parents' home, and he was fighting with his wife, holding that six-month-old infant in his arms? You remember he balled up the fist as to hit Doris when she says, "Mark, please, hand me the child so it won't get hurt"?

Don't forget how mindful he was with Sheila Smith's children when he went over there looking for Sharon Robinson, where he pulled a knife on Sheila Smith in the presence of her children.

Look at how he involved his 12–year–old son, coming in, obviously as a sympathy play for y'all. Imagine the fear that went through that child's mind.

[DEFENSE]: Your Honor, I object to that. For this defendant to have invoked his right to call witnesses, to be chastised therefore in front of this jury, is clearly improper, especially after the State invited us to bring these witnesses in in their argument in guilt or innocence.

THE COURT: Overruled.

The State argues that its argument was proper because it was a summary of the evidence, a reasonable deduction from the

evidence, and a plea for law enforcement. We disagree. "To argue that witnesses had been afraid to appear is no less harmful than arguing that their testimony has been coerced, ... [and when] unsupported by the evidence, is to inject new and harmful facts alluding to conduct of the appellant for which he is not on trial." *Washington*, 822 S.W.2d at 120 (alteration in original) (citing *Thomas v. State*, 519 S.W.2d 430, 431 (Tex.Crim.App. 1975)).

Having determined that it was error for the court to overrule Marks' objection, we proceed to a harm analysis. *Harris*, 790 S.W.2d at 587; TEX.R.APP.P. 81(b)(2). After isolating the error and all its effects, we cannot say that a rational trier of fact would have reached a different result if the alleged error and its effects had not resulted. *Id.* Utilizing the *Harris* factors, we hold that, when the comments complained of are viewed in the context of the evidence and the argument of counsel as a whole, the error was harmless. *Id.* We overrule point six.

## CONCLUSION

Having concluded that the evidence was sufficient to support a conviction for resisting arrest, that the court did not err in overruling Marks' *Batson* challenge concerning the State's peremptory strike against venire-member Number 6, and that the court did not err in overruling Marks' objections to the State's argument, we affirm the judgment.