Charles Elvin WHITAKER, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–97–046 CR.

Court of Appeals of Texas,
Beaumont.

Submitted Oct. 1, 1998.

Decided Nov. 4, 1998.

John D. MacDonald, II, Conroe, for appellant.

John S. Hollemand, Dist. Atty., William Lee Hon, Asst. Dist. Atty., Livingston, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

STOVER, Justice.

A jury found appellant Charles Whitaker guilty of capital murder. The trial court sentenced him to life imprisonment in the Texas Department of Criminal Justice—Institutional Division. Whitaker brings five points of error on appeal.

### FACTS

Charles Whitaker, Fred McGregor, and Danny Hill conspired for several hours to rob seventy-six year old Aline Berry, the owner and manager of the Berry Motel in Corrigan, Texas. In the middle of the night, they entered Ms. Berry's residence at the motel through an unlocked patio, found her in bed, and held her down while they tied her feet with electrical cord and her hands with pantyhose. Searching for money, they ransacked her home while she lay bound on her bed. The men took a money bag found at the residence and then fled the scene. McGregor left first to get the car. After McGregor brought the car around to the motel, Hill exited the residence and got into the car where he and McGregor waited for one or two minutes for Whitaker to come out of the residence. McGregor testified that when Whitaker reached the car, he (Whitaker) stated he had struck Ms. Berry and "laid the bitch to rest." The three men then drove to Hill's residence where they split the money.

James Riley, chief of police in Corrigan, Texas, arrived at the scene and found Ms. Berry, tied hand and feet, lying dead on her bed. He testified that her residence was in total disarray. He also stated it was known in the community that Ms. Berry kept large sums of money at her home; for that reason, Riley had previously advised her to make regular deposits rather than keep the money at her residence.

Investigator B.W. Emmons of the Montgomery County Sheriff's Department testified the cabinets had been opened in Ms. Berry's home, almost all the drawers in the home had been dumped to the floor, and the freezer was left open. The door to her safe was also standing open. On the bed next to Ms. Berry's body was a .22 pump rifle. The stock on the weapon was broken, and two large wooden splinters, which appeared to have come from the rifle's broken stock, were also found on the bed.

Vladimir Parungao, the assistant medical examiner of Harris County who performed the autopsy on Ms. Berry's body, stated Ms. Berry died from a blow to the right side of her head. He testified the cause of Ms. Berry's death was "suppressed head due to blunt trauma to the head." The dimensions of the end of the rifle butt were consistent with the dimensions of the depressed area on Ms. Berry's skull. Parungao further testified he observed contusions on the left upper

and lower lip, a contusion on the left side of the jaw, a faint linear abrasion on the left side of the face, and imprints where the wrists and ankles were tied.

## LEGAL AND FACTUAL SUFFICIENCY

■ In his first two points of error, Whitaker alleges the evidence is legally and factually insufficient to sustain the jury verdict finding appellant guilty of capital murder. He specifically argues the State failed to prove beyond a reasonable doubt there was a "nexus" between the murder of the victim and the taking of her property.

A person commits the offense of capital murder if he intentionally and knowingly causes the death of an individual while in the course of committing or attempting to commit certain delineated felonies, including robbery. TEX. PEN.CODE ANN. §§ 19.02(b)(1), 19.03 (Vernon 1994). The Penal Code provides a person commits robbery if, in the course of committing theft, and with intent to obtain or maintain control of the property, "he intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Pen. Code Ann. § 29.02 (Vernon 1994). Tracking the language in the Texas Penal Code, the jury charge defines "in the course of committing theft" to mean "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *See* TEX. PEN.CODE ANN. 29.01(1) (Vernon 1994).

■ In reviewing the legal sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, 573 (1979). The standard of review is the same for both direct and circumstantial evidence cases. *Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991).

■ In considering factual sufficiency, we view all the evidence without the prism of "in the light most favorable to the prosecution" and, thus, consider the testimony of defense witnesses and the existence of alternative hypothesis. *See Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996) and *Stone v. State,* 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd, untimely filed). The verdict is set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis,* 922 S.W.2d at 129. Our review must be "appropriately deferential" to the factfinder's determination to avoid substituting our judgment for that of the trier of fact. *Id.* at 133.

Citing TEX.CODE CRIM. PROC. ANN. art. 38.14, appellant first claims that a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Without McGregor's testimony, appellant contends the State fails to establish a nexus between the murder and the robbery. In *Knox v. State,* 934 S.W.2d 678, 686 (Tex.Crim.App.1996), the Court of Criminal Appeals explained the accomplice witness rule:

> To determine whether an accomplice's testimony is corroborated, we eliminate the accomplice testimony and review the remaining evidence to determine whether it tends to connect appellant to the offense. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex. Crim.App.1993). Further, we have stated:
>
> > Corroborative evidence need not establish appellant's guilt of the charged offense nor directly link appellant to the offense, but is sufficient if it "tends to connect" appellant to the offense. Each case must be considered on its own facts and circumstances—on its own merit. Apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Id.* (citations omitted).

■ Because a killing and an unrelated taking of property do not constitute capital murder under § 19.03(a)(2), to obtain a conviction for capital murder, the State "must prove a nexus between the murder and the theft, i.e. that the murder occurred in order to facilitate the taking of the property." *Ibanez v. State,* 749 S.W.2d 804, 807 (Tex.Crim.

App.1986); *Hernandez v. State,* 969 S.W.2d 440, 444 (Tex.App.—San Antonio 1998, pet. ref'd). In order for the killing of Aline Berry to qualify as a capital murder under § 19.03(a)(2), the intent to rob must be formed prior to or concurrently with the murder. *Robertson v. State,* 871 S.W.2d 701, 705 (Tex.Crim.App.1993); *Schexnider v. State,* 943 S.W.2d 194, 198 (Tex.App.—Beaumont 1997, no pet). Therefore, the State was required to prove beyond a reasonable doubt that Whitaker committed the murder during the commission of the underlying theft, or while in immediate flight, with intent to obtain or maintain control of the property. *Hernandez,* 969 S.W.2d at 444. If a jury could rationally conclude that Whitaker formed the intent to obtain control of the victim's property before or during the commission of the murder, then the evidence would support a conclusion that the murder occurred in the course of robbery. *Dillard v. State,* 931 S.W.2d 689, 696 (Tex.App.—Dallas 1996, pet. ref'd, untimely filed).

In addition to the accomplice McGregor's testimony concerning Whitaker's involvement in the planning of the robbery, the robbery itself, and the murder, the record also contains additional evidence showing the formation of Whitaker's intent to rob Aline Berry prior to the murder, along with other evidence connecting Whitaker to the charged offense. LaTonya Washington, who lived with Hill and claimed to be his wife, testified Hill told her in the early morning hours of April 9, 1995, that they (Whitaker, Hill, and McGregor) were going to rob the motel. According to LaTonya, she told him, "You're crazy." She also told Hill immediately before he went out the door that he needed to sit himself down before he ended up in a lot of trouble. The next time LaTonya saw the three men, they were in her bedroom passing out money; they gave her approximately $300, which she gave to the authorities. She knew what they had done.

Also testifying for the State was Billy Joe McCullar, an inmate at the Polk County Jail, who, for a time, shared a cell with Whitaker. McCullar stated that Whitaker told him they planned the robbery, wore stockings over their faces and socks over their hands, went to Berry's house, entered the house, tied her feet and hands, and found the safe. According to McCullar, appellant related to him that he (Whitaker) hit Berry with a gun on the head to quiet her. Whitaker also told McCullar he and his accomplices then split the money at Hill's place.

Appellant points to the testimony of jail nurse Connie Franklin who was present during a conversation between Whitaker and McCullar. According to Franklin, Whitaker asked McCullar if he (Whitaker) had ever told McCullar that he had killed or hurt anyone. McCullar responded to Whitaker by stating that Whitaker had not told him anything—that Whitaker had, in fact, told McCullar that he was innocent.

In viewing the direct and circumstantial evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. There is evidence not only from the accomplice McGregor, but also from LaTonya Washington and Billy McCullar, that connects Whitaker with the crime. Both Washington and McCullar expressly testified that Whitaker and his co-conspirators planned the robbery of Aline Berry beforehand. McCullar further testified Whitaker told him the three men went to her residence, ransacked her house looking for money, stole a bag of money, and killed her in the process. Since the record establishes a "nexus" between the robbery of Aline Berry and her murder, the evidence is legally sufficient to sustain the verdict. We also find the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Points of error one and two are overruled.

## *BATSON* POINTS

In points of error three and four, Whitaker contends the trial court erroneously denied his *Batson* objection to the State's use of peremptory challenges upon two prospective black jurors,[1] Ollie Mae Punch and Carol McGowen. In *Purkett v. Elem,* the United States Supreme Court employed a

1. Two black jurors sat on the jury.

three-step process to determine whether race-based strikes were exercised:

(1) The opponent of a peremptory challenge must make out a prima facie case of racial discrimination;

(2) The burden then shifts to the proponent of the strike to come forward with a race-neutral explanation; and

(3) If a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834, 839 (1995) (per curiam). In evaluating the race-neutrality of a prosecutor's explanation, an appellate court must determine whether, assuming the reasons given are true, the use of the peremptory challenge violated the Equal Protection Clause as a matter of law. *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). A neutral explanation means an explanation based on something other than the race of a juror. *Id.* 500 U.S. at 360, 111 S.Ct. 1859. At this step, the issue is the facial validity of the prosecutor's explanation. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett*, 514 U.S. at 767–68, 115 S.Ct. 1769. Indeed, the answer can be silly, superstitious, fantastic, or implausible and need not be even minimally persuasive. *Id.* at 768, 115 S.Ct. 1769. In the third step, the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Id.*

■ We review the record of the *Batson* hearing and voir dire examination in the light most favorable to the trial court's ruling. *Pondexter v. State*, 942 S.W.2d 577, 581 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). A trial court's finding that peremptory strikes were not racially motivated will be upheld on appeal so long as the finding is not "clearly erroneous." *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Crim.App.1989). Under the "clearly erroneous" standard, this court may only reverse the trial court's ruling if a review of the voir dire record, the State's explanations, the composition of the jury panel, and the appellant's rebuttal and impeachment evidence leaves us with the definite and firm conviction that a mistake has been made. *Lamons v. State*, 938 S.W.2d 774, 776 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd); *see also Hill v. State*, 827 S.W.2d 860, 865 (Tex.Crim.App.1992). We accord great deference to the trial judge who was present to assess the credibility of the prosecutor and his explanations.

■ Venireperson Ollie Mae Punch was one of ten persons who responded affirmatively to the State's question asking whether or not any venire person, "a close friend or relative [had] ever been arrested, charged with or convicted of a crime." Ms. Punch stated she had a niece and in-laws who were in jail charged with theft; she agreed they were "close." She also stated she had not discussed their cases with them, she did not believe they had been mistreated, and their arrests would not affect her verdict. Although the prosecutor struck Ms. Punch, he did not strike four white jurors who had also indicated they had relatives or friends arrested, charged, or convicted of a crime.

■ Appellant argues the State failed to articulate a race-neutral reason for striking prospective juror Punch. The reasons articulated by the State for striking Ms. Punch are:

(a) She had two in-laws charged with theft.

(b) The State had information that Ms. Punch was a reference for a felony DWI probationer who was on probation in San Jacinto County.

(c) The District Attorney told him (the prosecutor) there were a number of Punches in San Jacinto County [where the case was tried] whose felony cases the District Attorney was familiar with.

(d) Ms. Punch was from Shepherd as was Kenneth Punch who had been prosecuted by neighboring Polk County and sent to prison.

Along with other courts, we find the reason proffered by the State regarding relatives

with criminal backgrounds to be race-neutral on its face. As noted by one court, "[k]inship to a person who has had trouble with the law is a racially neutral reason for striking a juror." *Young v. State,* 848 S.W.2d 203, 209 (Tex.App.—Dallas 1992), *pet. ref'd,* 856 S.W.2d 175 (Tex.Crim.App.1993).

■ Whitaker further directs us, however, to the alleged discriminatory manner in which the State exercised a peremptory challenge on Ms. Punch. While disparate treatment of veniremembers with similar characteristics may indicate a racial bias, the record must reflect more than the mere fact that the objectionable characteristic of a stricken juror was also possessed by accepted jurors of a different racial background. *Cantu v. State,* 842 S.W.2d 667, 689 (Tex.Crim.App. 1992); *Lamons,* 938 S.W.2d at 778. Although the prosecutor in the instant case admitted he did not strike some whites who also had family members with criminal records, he denied treating prospective white jurors differently from prospective black jurors.

We recognize that potential jurors commonly possess similar objectionable characteristics, but in varying degrees. As a result, jury selection often hinges on the interaction of a number of variables and permutations. *Lamons,* 938 S.W.2d at 778.

"Disparate treatment," as such, cannot automatically be imputed in every situation where one of the State's reasons for striking a venireperson would technically apply to another venireperson whom the State found acceptable. The decision to strike a particular venireperson is not susceptible to rigid quantification; rather, it is a fluid process, often hinging on the interaction of a number of variables and permutations. For example, it is unlikely that two venirepersons on one panel will possess the same

objectionable attribute or character trait in precisely the same degree. Such qualitative distinctions may cause a prosecutor to challenge one venireperson and not the other.

Thus, when the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual.

*Cantu,* 842 S.W.2d at 689 (citations omitted). The State's reasons for striking Ms. Punch included the fact that she had two in-laws charged with theft. Her voir dire testimony, which we also consider in our review, reveals that she also had a niece charged with theft. The fact that she has three relatives in trouble with the law is a difference in degree from the four white venirepersons whom the State did not strike. Each of the four testified to having a single relative charged or convicted of a crime.

The prosecutor also based his strike of Ms. Punch on information he received from the San Jacinto District Attorney's office. According to that information, there were other persons in the county with the name of Punch, who were charged with felonies, and one Kenneth Punch from the Shepherd area who had been sent to prison.[2] Venireperson Punch was likewise from the Shepherd area. In *Lopez v. State,* 940 S.W.2d 388, 391 (Tex. App.—Austin 1997, pet. ref'd), the prosecutor's strike was similarly based on information from law enforcement officers who stated that a particular panel member would not make a good juror. The Austin court held that "[m]erely identifying the *source* of the information did not provide the district court with a legitimate, race-neutral reason for the State's strike." *Id.* (emphasis added) In the instant case, the prosecutor not only provid-

2. In an effort to show disparate treatment, Whitaker contends that San Jacinto County authorities did not run background checks on all the white prospective jurors. The prosecutor stated that he "sat down with the District Attorney of San Jacinto County and went over the individuals that were on the jury list to get whatever information he had concerning them. And one of the things he told me about, we got to Ms. Punch, he had prosecuted a number of individuals or a number of individuals that had been

charged with felonies by the name of Punch that were from the Shepherd area where she lived." When asked if he learned someone had run all the names of the jury panel for background checks, the prosecutor responded, "I don't know." The record does not establish whether background checks were run on all the jurors. The prosecutor's testimony simply indicates he went over the individuals on the jury list with the District Attorney.

ed the source but also the specific information on which he based his strike. We find that the information is race neutral, and that Whitaker did not meet his burden of showing that any disparate treatment was racially motivated.

 In addition to his claim of a race-based strike, Whitaker points to the perfunctory nature of the State's examination of Ms. Punch and the fact that the State never questioned her about how her name came to be used as a reference for a probationer or if she had even consented to the use of that name for that purpose. "While it is true that a lack of questioning might expose the weakness of the State's explanation, the State is not required to ask a specified rubric of questions." *Tate v. State*, 939 S.W.2d 738, 745 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd) (citing *Chambers v. State*, 866 S.W.2d 9, 24 (Tex.Crim.App.1993)). The trial court was in the best position to observe the prospective juror's demeanor in responding to the State's questioning and to determine the credibility of the prosecutor's explanation. We conclude the questions the prosecutor did ask, in conjunction with the additional information he received from the District Attorney's office, were sufficient. Appellant's contention that the State did not question the potential juror, without more, does not convince this court that the trial court's decision was "clearly erroneous."

After examining the record, we find appellant's rebuttal of the race-neutral reasons offered by the State insufficient to establish that the State's reasons were a pretext for the peremptory strikes. We, therefore, find the trial court's finding was not clearly erroneous; we are not left with a firm conviction that a mistake has been made. Point of error three is overruled.

 Whitaker also challenges the State's peremptory strike of venireperson Carol McGowen in point of error four. Incorporating his arguments from point of error three, he again alleges *Batson* violations. During the *Batson* hearing, the prosecutor gave the following reasons for striking McGowen:

1. She wore a nose ring.

2. She was inattentive (appeared to close her eyes and nod) during the prosecutor's voir dire.

3. When the panel was asked by defense counsel if anyone had ever been falsely accused of anything, she responded by raising her hand.

4. The prosecutor stated he had been informed by the San Jacinto District Attorney that a "McGowen" was recently charged with a felony offense in San Jacinto County.

In light of the United State Supreme Court's analysis in *Purkett*, we conclude the State proffered race neutral reasons for striking McGowen. A nose ring, which no other juror wore and which appellant did not establish was characteristic of any particular racial group, is a race neutral reason, as is juror inattentiveness. *See Dorsey v. State*, 940 S.W.2d 169, 175 (Tex.App.—Dallas 1996, pet. ref'd) (sleeping or inattentiveness); *Lamons*, 938 S.W.2d at 778 (inattentiveness); *Bryant v. State*, 923 S.W.2d 199, 209 (Tex.App.—Waco 1996, pet. ref'd) (earrings). These, coupled with the prosecutor's testimony that McGowen raised her hand when asked if anyone had ever been falsely accused, represent multiple race neutral reasons for the peremptory strike. When the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual. *Cantu*, 842 S.W.2d at 689. Where, as here, the State has offered multiple race neutral reasons for its peremptory strike, we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes is sufficient to establish disparate treatment. We again conclude the State offered race neutral reasons for striking McGowen, and appellant did not rebut those proffered reasons with evidence of discriminatory intent. Point of error four is overruled.

 In point of error five, Whitaker contends the "trial court committed reversible error when it proceeded with a hearing on the appellant's motion for new trial without the appellant being present." It is undisputed Whitaker was not present at the hearing on the motion for new trial.

COURT: Let the Record reflect that Mr. Whitaker is not present at the hearing due to no fault of Mr. Jefferson or Mr. Holleman. He was not bench warranted over by the Court to be present for this hearing.

[DEFENSE COUNSEL]: On the Record, I'm not making a point of that. I believe it's a critical stage, but I think it's a matter subject to any, subject to waiver, and I'm, the 75th day is fast approaching. I need the Court to act on the Motion for New Trial and I have, as I said, filed a notice of appeal.

There is no evidence in the record that appellant's counsel at the motion for new trial had requested a bench warrant for his client to be present at the hearing. Although the trial judge specifically stated he did not issue a bench warrant for Whitaker, through no fault of either appellant's counsel or the State, Whitaker's counsel specifically stated he (counsel) did not choose to make an issue of it. Since the seventy-fifth day was approaching when the motion for new trial would be overruled by operation of law if not heard by the trial court, the defendant's trial counsel indicated he wanted to have the hearing even if appellant was not present. Trial counsel made no objection to the fact that Whitaker was not present. As a result, we conclude that appellant's right to be present at the hearing on the motion for new trial was waived. *See Coons v. State,* 758 S.W.2d 330, 339 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd); *Escarcega v. State,* 711 S.W.2d 400, 402 (Tex.App.—El Paso 1986) *pet. dism'd, improvidently granted,* 767 S.W.2d 806 (Tex.Crim.App.1989); Tex.R.App. P. 33.1(a). Furthermore, there was no error in conducting the hearing without Whitaker, since all questions raised by the motion were determinable from the evidence already before the court. *See Bumpus v. State,* 509 S.W.2d 359, 363 (Tex.Crim.App.1974). Point of error five is overruled.

We affirm the judgment and sentence of the trial court.

AFFIRMED.