ACCEPTED
03-14-00484-CR
6516013
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/17/2015 9:00:27 AM
JEFFREY D. KYLE
CLERK

**03-14-00484-CR**

**IN THE COURT OF APPEALS**

**FOR THE**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/25/2015 4:50:27 PM
JEFFREY D. KYLE
Clerk

**THIRD SUPREME JUDICIAL DISTRICT OF TEXAS**

---

**MICHELLE ELAINE GAMBLES**

**APPELLANT**

**VS.**

**THE STATE OF TEXAS**

**APPELLEE**

---

ON APPEAL FROM THE COUNTY COURT AT LAW NUMBER 2 OF
BELL COUNTY, TEXAS. CAUSE NUMBER 2C13-07485

---

**APPELLANT'S BRIEF**

---

Respectfully submitted,

Michael Floyd White
Texas Bar No. 00785231
100 Kasberg Drive, Suite A
Temple, Texas 76502
Email: lawyer@vvm.com

Bobby Dale Barina
Texas Bar No. 01738480
Tyler Woudwyk
Texas Bar No. 24084120
455 East Central Texas Expressway
Suite 104
Harker Heights, Texas 76548
Tele: (254) 699-3755
Fax: (254) 699-1074
Email: BobbyDaleBarina@BarinaLaw.Com
ATTORNEY FOR APPELLANT

# IDENTIFICATION OF THE PARTIES

Pursuant to Tex.R.App.P 38.6(a), a complete list of the names and addresses of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recess themselves from participating in the decision of this case.

**Complaint, victim or aggrieved party:**
The State of Texas

**Appellant or criminal Defendant:**
Michelle Elaine Gambles
1018 Arnold Drive
Bartlett, Texas 76511

**Trial counsel for Appellant:**
Michael F. White
100 Kasberg Drive, Suite A
Temple, Texas 76502

David Fernandez, Jr.
P.O. Box 5120
Temple, Texas 76505

**Appeal counsel for Appeal:**
Bobby Dale Barina
Tyler Woudwyk
455 East Central Texas Expressway, Suite 104
Harker Heights, Texas 76548

Michael F. White
100 Kasberg Drive, Suite A
Temple, Texas 76502

**Appeal Counsel for the State:**
Steve Morris
1201 Huey Road
Belton, Texas 76513

**Trial counsel for the State:**
Mark Currier
1201 Huey Road
Belton, Texas 76513

**Trial Judge**
Honorable John Mischtian
1201 Huey Road
Belton, Texas 76513

# **TABLE OF CONTENTS**

PAGE NUMBER

IDENTIFICATION OF THE PARTIES ...................................................................2

INDEX TO AUTHORITIES ..................................................................................5

STATEMENT OF THE NATURE AND RESULT OF THE CASE .....................6

STATEMENT OF FACTS .....................................................................................7

ISSUES PRESENTED .........................................................................................40

    Issue number 1
      The evidence presented at trial was insufficient to uphold the jury verdict of
      guilt.

ARGUMENT AND AUTHORITIES ....................................................................40

CONCLUSION .....................................................................................................45

PRAYER ...............................................................................................................45

CERTIFICATE OF SERVICE .............................................................................46

CERTIFICATE OF COMPLIANCE.....................................................................46

# INDEX TO AUTHORITIES

**PAGE**

Cases

Anderson v. State,
 707 S.W.2d 267 (Tex.App.-Houston [1st Dist.] 1986) ......................... 42, 44

Brooks v. State,
 323 S.W.3d 893 (Tex.Crim.App.2010) ............................................... 41

Bryant v. State,
 923 S.W.2d 199 (Tex.App.-Waco 1996)............................................. 43

Clayton v. State,
 235 S.W.3d 772 (Tex.Crim.App.2007) ............................................... 41

Gharbi v. State,
 131 S.W.3d 481 (Tex.Crim.App.2003) ............................................... 41

Gollihar v. State,
 46 S.W.3d 243 (Tex.Crim.App.2001) ................................................. 41

Gray v. State,
 152 S.W.3d 125 (Tex.Crim.App.2004) ............................................... 41

Jackson v. Virginia,
 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)........................ 41

Malik v. State,
 953 S.W.2d 234 (Tex.Crim.App.1997) ............................................... 41

Raymond v. State,
 640 S.W.2d 678 (Tex.App.-El Paso 1982) .......................................... 42, 44

Sheehan v. State,
201 S.W.3d 820 (Tex. App. -Waco 2006)............................................ 41, 42, 44


Statutes

Tex. Crim. Proc. Code Ann. Art 36.14 (West 2012) ............................ 41
Tex. Penal Code Ann §38.03 ............................................................. 6, 40, 45


Rules

Tex R. App. P. 38.6(a) ...................................................................... 2

## STATEMENT OF THE NATURE AND RESULT OF THE CASE

The Appellant was charged by information on October 2, 2013 with Resisting Arrest or Search in violation of Tex. Penal Code Ann §38.03. R.R. Vol 4, p. 7.  The Appellant entered a plea of not guilty and proceeded to jury trial. R.R. Vol 4, p.8. The jury found her guilty R.R. Vol 6, p.70 and assessed punishment. Appellant was sentenced to 6 days confinement in Bell county jail and a zero dollar fine R.R. Vol 7, p.58.

<u>STATEMENT OF FACTS</u>

GUILT/INNOCENCE PHASE OF THE TRIAL

**VOLUME 4 OF 9**

**THE STATE'S CASE IN CHIEF R.R. VOL. 4, p. 27**

**Mark Koenig R.R. Vol 4, p. 27**

The State's first witness was Mark Koenig R.R. Vol 4, p. 27. He was an apprentice plumber for MY Plumbing Company at the time of the incident R.R. Vol 4, p. 28. He was called to a service call on September 11, 2013 at 1809 Stardust in Bell County Texas R.R. Vol4, p.29.

The owner of MY Plumbing (Young) drove to the location of the service call R.R. Vol 4, p.30. Soon after arriving, as he was unloading materials, he was accused by a neighbor of speeding down the road R.R. Vol 4, p.31. The neighbor was identified as the Appellant R.R. Vol 4, p.31. Appellant was agitated R.R. Vol 4, p.32, and Young went to speak with her for two to three minutes R.R. Vol 4, p.33.

Young then made a phone call R.R. Vol 4, p.33, to 911 dispatcher R.R. Vol 4, p.34. Young described Appellant to dispatcher R.R. Vol 4, p.34. Two officers soon arrived one after the other R.R. Vol 4, p.35, Lawson (Lawson) first and then Firebaugh (Firebaugh) R.R. Vol 4, p. 35. Lawson proceeded to separate the parties R.R. Vol 4, p.35 and then approached the Appellant R.R. Vol 4, p.35.

Lawson attempted to calm the Appellant R.R. Vol 4, p.36 but was unsuccessful R.R. Vol 4, p.36. Firebaugh attempted to talk to Plumbers R.R. Vol 4, p.37, but had to go assist Lawson R.R. Vol 4, p.37. The officers then attempted to arrest Appellant R.R. Vol 4, p.37. Lawson attempted to detain Appellant and put her in handcuffs R.R. Vol 4, p.37. Lawson successfully got one had cuffed R.R. Vol 4, p.38 and Appellant jerked other hand away from Lawson R.R. Vol 4, p.38. Appellant broke away from Lawson R.R. Vol 4, p.38 by spinning away R.R. Vol 4, p.38. Appellant and Lawson then went to the ground R.R. Vol 4, p.39. Appellant continued to yell while on the ground R.R. Vol 4, p.40. There was another neighbor also present R.R. Vol 4, p.40 on her porch R.R. Vol 4, p.41.

**CROSS-EXAMINATION R.R. Vol 4, p.41**

He never talked to police R.R. Vol 4, p.42. He was present when the officers interviewed Young R.R. Vol 4, p.43. He was present when Young called 911 R.R. Vol 4, p.43. Young called Appellant a short, black, fat woman R.R. Vol 4, p.45. Young told dispatcher that Appellant was putting a voodoo hex on him R.R. Vol 4, p.45. Appellant did not strike officers with her hands, feet, elbows, knees, head, or teeth R.R. Vol 4, p.48. He saw nothing that indicated Appellant was trying to injure Lawson R.R. Vol 4, p.48, or Firebaugh R.R. Vol 4, p.48. Appellant was waving her arms and being loud R.R. Vol 4, p.49, but no use of physical force R.R. Vol 4, p.50.

Firebaugh had a stun gun that was black and yellow and looked like a gun R.R. Vol 4, p.52. Firebaugh dry stuns Appellant with Taser in the back. R.R. Vol 4, p.53. Appellant reacted to stun as if she was in pain R.R. Vol 4, p.55. Stun lasted two to three seconds R.R. Vol 4, p.55. Appellant tried to tell Firebaugh to stop R.R. Vol 4, p.55, which he did R.R. Vol 4, p.55.

Lawson then escorted Appellant to the car R.R. Vol 4, p.56. The officers seemed a little upset R.R. Vol 4, p.55.

## REDIRECT EXAMINATION OF MARK KOENIG R.R. Vol 4, p. 56

Appellant did not use force against the officers prior to being on the ground R.R. Vol 4, p.57. Lawson tried to arrest Appellant before going to the ground R.R. Vol 4, p.57. Appellant used a little bit of force to break Lawson's grasp R.R. Vol 4, p.58.

## RECROSS-EXAMINATION R.R. Vol 4, p.60

Appellant did not make physical contact with Lawson in jerking away R.R. Vol 4, p.60.

## SHEENA MENDEZ R.R. Vol 4, p. 61

She is daughter of the owners of 1809 Stardust R.R. Vol 4, p.62. She was present at the time of the incident to let the plumbers (Young and Koenig) into her parent's house R.R. Vol 4, p.63. The plumbers were already present when she arrived R.R. Vol 4, p.64. Appellant was crossing the street when she arrived R.R.

Vol 4, p.64, yelling that the plumbers were speeding down the street R.R. Vol 4, p.64. She apologized that the plumbers were speeding and tried to explain that they would be gone in five to ten minutes R.R. Vol 4, p.64. This did not appease or calm Appellant R.R. Vol 4, p.65. She then retreated into the house waiting for police to arrive R.R. Vol 4, p.65.

After officers arrived, Lawson spoke to Appellant R.R. Vol 4, p.67. Appellant was yelling and upset R.R. Vol 4, p.68. Firebaugh was speaking to the plumbers, R.R. Vol 4, p.69, and Lawson turned to approach and speak with the plumbers R.R. Vol 4, p.69. Lawson told Appellant that if she did not calm down she would be arrested R.R. Vol 4, p.70. Appellant did not calm down and Lawson began to arrest her R.R. Vol 4, p.70.

Lawson grabbed Appellant's hand and put it behind Appellant's back R.R. Vol 4, p.70. Appellant wiggled around at tried to get away R.R. Vol 4, p.71. Firebaugh assisted and the officers and Appellant ended up on the ground R.R. Vol 4, p.73. Firebaugh stunned Appellant because she would not comply R.R. Vol 4, p.73. The struggle on the ground lasted a few minutes R.R. Vol 4, p.73. Appellant was placed in handcuffs and was still yelling R.R. Vol 4, p.74, as they escorted Appellant to the patrol car R.R. Vol 4, p.74. She never gave a statement to the officers R.R. Vol 4, p.75, or spoke with either the officer R.R. Vol 4, p.75.

**CROSS-EXAMINATION R.R. Vol 4, p.77**

Neither officer asked her what she had seen R.R. Vol 4, p.78. She did not see a knee strike to Appellant's side by either officer R.R. Vol 4, p.79. Firebaugh stunned Appellant for several seconds and she screamed out in pain R.R. Vol 4, p.79. She never saw Appellant swing, kick, bite, head butt or scratch at the Officers R.R. Vol 4, p.80. As the officers where on top of Appellant on the ground she did not use physical force against officers R.R. Vol 4, p.80. Appellant was wiggling to get away R.R. Vol 4, p.81.

**Volume 5 of 9**

**MICHAEL YOUNG VOL. 5 p.4**

He is owner of MY Plumbing company and a licensed plumber R.R. Vol 5, p.7. He arrived at 1809 Stardust on date in question in the afternoon R.R. Vol 5, p.8. He was approached by Appellant R.R. Vol 5, p.8, and she began yelling at him R.R. Vol 5, p.8. He ignored her and went to the door for the service call R.R. Vol 5, p.8.

He then called 911 R.R. Vol 5, p.9. Appellant called him demoned (sic) and white devil R.R. Vol 5, p.10, and asked the good lord to put a whooping on his soul R.R. Vol 5, p.10. Appellant then began speaking in tongues R.R. Vol 5, p.10. He told Appellant to call the police R.R. Vol 5, p.11, and when she did not he did R.R. Vol 5, p.11.

Shortly after he called, the police arrived R.R. Vol 5, p.12. He and Mendez retreated into the house R.R. Vol 5, p.12. He then went to address the plumbing situation and then the two officers arrived in separate cars R.R. Vol 5, p.13. He began to speak with Firebaugh while Lawson spoke with Appellant R.R. Vol 5, p.14. He identified Appellant R.R. Vol 5, p.15. Lawson was attempting to calm the Appellant but was unable to do so R.R. Vol 5, p.16. Lawson then grabbed her wrist and Appellant tried to spin out of it R.R. Vol 5, p.17. Appellant and Lawson then went to the ground together R.R. Vol 5, p.17, and Appellant kept her hands under her chest as she laid on the ground R.R. Vol 5, p.17. The Officers asked her to give up her hands R.R. Vol 5, p.17. He demonstrates how Appellant tried to break the Officers grasp R.R. Vol 5, p.18.

Appellant complained about being in pain R.R. Vol 5, p.20. Appellant was in shock and did not know why she was being arrested R.R. Vol 5, p.20. After they went to the ground Firebaugh went to assist Lawson R.R. Vol 5, p.21. Appellant struggled with the officers for two to five minutes R.R. Vol 5, p.21. Appellant was then tased by Firebaugh in the small of her back R.R. Vol 5, p.23. Appellant was tased twice before she was handcuffed R.R. Vol 5, p.24. He provided the police with a written statement after the incident R.R. Vol 5, p.26.

**HEARING OUTSIDE THE PRESENCE OF THE JURY R.R. Vol. 5, p. 26**

Hearing concerned the fact that defense had never been provided a copy of

the witness's statement and no supplement to the officer's report or reference in the report to the existence of any such statement. Defense was provided a copy of the statement R.R. Vol 5, p.26-28 The court proceeds in front of the jury R.R. Vol 5, p.28.

**CROSS-EXAMINATION R.R. Vol. 5, p 30**

He called Appellant a witch, and a fat, black, lady R.R. Vol 5, p.30. Appellant did not like being called black, so he corrected himself by calling her African American R.R. Vol 5, p.31. He testified that Appellant was yelling at him for speeding through the neighborhood R.R. Vol 5, p.32, but he was not speeding R.R. Vol 5, p.32. He told 911 dispatcher that he thought Appellant was nuts R.R. Vol 5, p.33 after being asked if drugs or alcohol were involved R.R. Vol 5, p.33. He was not on drugs that day or any day R.R. Vol 5, p.34.

**HEARING OUTSIDE THE PRESENCE OF THE JURY R.R. Vol. 5, p. 34**

**BILL OF EXCEPTION R.R. Vol. 5, p. 39**

Hearing concerned whether witness had opened door to impeachment evidence regarding his own use of drugs or alcohol by his previous statement. Witness had previously been on deferred adjudication for possession of a controlled substance R.R. Vol 5, p.35. State argues that Defense is attempting to open the door by leading the witness in violation of the motion in limine R.R. Vol 5, p.36.

Outside the presence of the jury, the Appellant's counsel made a Bill of Exceptions.

Mr. Young testified that he had not been on drugs on any day R.R. Vol 5, p. 39, Mr. Young believes that would mean any days since his birth R.R. Vol 5, p.40. Mr. Young had been in front of the District Court of Coryell County R.R. Vol 5, p.40, for possession charges R.R. Vol 5, p.40. Mr. Young pled guilty to 2 of the charges R.R. Vol 5, p.41 and had used Methamphetamine and marijuana R.R. Vol 5, p.43.

After the testimony, the state abandoned their objections to testimony concerning Mr. Young's previous drug possession and use. The court allowed the testimony.

**CONTINUATION CROSS-EXAMINATION OF MICHAEL YOUNG R.R. Vol. 5, p. 43**

He admitted to lying to the jury R.R. Vol 5, p.44. He had previously used both methamphetamine and marijuana R.R. Vol 5, p.45.

Appellant did not knee the officer, kick the officer, head butt, bite or scratch the officer R.R. Vol 5, p.47-48. While on the ground the officers struggle to restrain Appellant's hands R.R. Vol 5, p.50. Appellant was screaming that she was in pain R.R. Vol 5, p.50. After instructing Appellant to give up her hands three times R.R. Vol 5, p.50, Firebaugh tased the Appellant R.R. Vol 5, p.51. Firebaugh warned Appellant again and tased her a second time R.R. Vol 5, p.52. Appellant

was flaying her feet around but he does not recall them ever striking the officers R.R. Vol 5, p.52. He did not recall the officer's indicating that they were in pain. R.R. Vol 5, p.53.

He agrees that it would be helpful to have a video of the incident. R.R. Vol 5, p.53.

## REDIRECT EXAMINATION OF MICHEAL YOUNG R.R. Vol. 5, p. 54

He reviewed his written statement R.R. Vol 5, p.54. Appellant tried to spin away from Lawson prior to being on the ground R.R. Vol 5, p.56. They then went to the ground R.R. Vol 5, p.57. He was placed on probation for 3 years for drug possession R.R. Vol 5, p.58. He has used drugs since he was off probation R.R. Vol 5, p.58, but was not the day of the incident R.R. Vol 5, p.58.

## RECROSS-EXAMINATION R.R. Vol 5, p. 58

He lied to the jury about never using drugs but also used drugs since probation R.R. Vol 5, p.58.

## TONYA LAWSON R.R. Vol. 5, p. 60

She is a police officer with Killeen Police Department R.R. Vol 5, p.61. She works from 2:00 P.M. to midnight R.R. Vol 5, p.61. She received a dispatch to 1809 Stardust on September 11, 2013 R.R. Vol 5, p.62, in Killeen, Bell county, Texas R.R. Vol 5, p.62. She is a one man unit R.R. Vol 5, p.63. Upon arrival, she noticed a black female (later identified as Appellant) running toward her patrol

vehicle R.R. Vol 5, p.63, and she immediately exited the vehicle R.R. Vol 5, p.63.

Appellant was screaming and pointing at the plumbers R.R. Vol 5, p.64. She attempted to calm the Appellant R.R. Vol 5, p.64, but appellant continued to scream about the plumbers. Appellant was overly agitated for the situation, in her opinion R.R. Vol 5, p.64. She was unable to calm appellant R.R. Vol 5, p.67. Appellant continued to scream for a couple of minutes R.R. Vol 5, p.67.

She began to walk toward the plumbers so she could get the situation from him R.R. Vol 5, p.67. Firebaugh was present at this time R.R. Vol 5, p.68, already speaking with the plumbers R.R. Vol 5, p.68. Firebaugh could see her back so she turned to walk toward plumbers and Firebaugh when Firebaugh ran toward her R.R. Vol 5, p.68. She turned around and Appellant was charging either her or the plumbers R.R. Vol 5, p.68.

Firebaugh reached Appellant first and grabbed her left arm R.R. Vol 5, p.69. The Officers were going to arrest her for loud noise R.R. Vol 5, p.69. She then grabbed for her right arm R.R. Vol 5, p.69. She gained a hold of her arm R.R. Vol 5, p.70, and Appellant twisted to get away R.R. Vol 5, p.70.

She and Appellant then fell to the ground R.R. Vol 5, p.70. Appellant tucked her arms under her chest R.R. Vol 5, p.71, as she continued to kick and scream R.R. Vol 5, p.71. Firebaugh then removed the cartridge from his taser R.R. Vol 5, p.71. Removing cartridge localizes stun instead of stunning a person's

entire body R.R. Vol 5, p.71.

She and Firebaugh then repeatedly ordered Appellant to give up her hands R.R. Vol 5, p.72. Appellant continued to kick and scream and Firebaugh then tased Appellant R.R. Vol 5, p.72. Officers then placed her hands behind her back and handcuffed her R.R. Vol 5, p.72. Appellant continued to kick and scream R.R. Vol 5, p.72.

Appellant refused to stand up and was escorted by the officers to the patrol cars R.R. Vol 5, p.73. She then searched Appellant R.R. Vol 5, p.74. Appellant began to yell that she was raping her R.R. Vol 5, p.75. Appellant continued to kick her legs but did not actually kick her R.R. Vol 5, p.75.

She was dressed in full uniform and arrived in her marked Killeen Police Department Vehicle R.R. Vol 5, p.75. She has a COBAN in car video system in her car R.R. Vol 5, p.76. The camera was looking forward in her car near rearview mirror R.R. Vol 5, p.77. The incident occurred behind her vehicle R.R. Vol 5, p.77. No recording exists from the COBAN in the police's System R.R. Vol 5, p.79.

She drove Appellant to jail R.R. Vol 5, p.79. Appellant was speaking in what sounded like tongues or in a foreign language R.R. Vol 5, p.80.

**CROSS-EXAMINATION R.R. Vol. 5, p. 81**

She believes that all interactions between the police and the public should be

recorded R.R. Vol 5, p.82. Killeen Police Department policy requires that officers record themselves or another officer to ensure device is functioning properly R.R. Vol 5, p.87. She failed to record at the beginning of her shit to ensure the COBAN device was functioning R.R. Vol 5, p.88. She was reprimanded for failing to do so R.R. Vol 5, p.88. She turned the device on, but did not ensure that it functioned properly R.R. Vol 5, p.88. She got a new microphone as soon as she released Appellant to the Jail R.R. Vol 5, p.89.

Her supervisor requested a copy of the video as soon as she released Appellant to the jail R.R. Vol 5, p.91. The COBAN system automatically uploads to the central server R.R. Vol 5, p.92. She could name video files with name, case number etc. R.R. Vol 5, p.92, but she did not because the mic was not working R.R. Vol 5, p.93.

She is required to fill out a form KPD 339-03 Equipment Serviceability Checklist at the beginning of each shift R.R. Vol 5, p.94. She failed to note that the microphone was not working R.R. Vol 5, p.95. Not following the prescribed policy was a mistake on her part R.R. Vol 5, p.99.

She believed her report to be accurate R.R. Vol 5, p.102. She often will review notes and the video in making report R.R. Vol 5, p.104. She would interview and take statements from witnesses, if she can R.R. Vol 5, p.104, But she was unable to in this case R.R. Vol 5, p.105. Detectives would do the following

interviews if witnesses are identified in the initial report R.R. Vol 5, p.105.

She did not write any supplements to her report R.R. Vol 5, p.106. She recalled the plumber and another female, but she does not recall anything about the female R.R. Vol 5, p.107.

She does not know how to edit, erase or destroy the audio-video R.R. Vol 5, p.110. Depending on the case audio-video recordings can be evidence, but not in this case R.R. Vol 5, p.111. She believes that she was professional and competent in handling this case R.R. Vol 5, p.112.

When she decided to arrest Appellant, Firebaugh grabbed the left hand and she attempted to get a hold of Appellant's right hand R.R. Vol 5, p.116. Appellant pulled away before she could get a hold R.R. Vol 5, p.116. They then go to the ground R.R. Vol 5, p.116. She falls to the ground first and then Appellant and Firebaugh fall to the ground R.R. Vol 5, p.117. Appellant used active resistance as opposed to passive resistance R.R. Vol 5, p.117. Appellant was resisting from the time she pulled away from her R.R. Vol 5, p.119.

Appellant had pepper spray in her hand while on the ground R.R. Vol 5, p.120. She hurt her knee a little when she fell to the ground R.R. Vol 5, p.121. She did not recall anyone saying that Appellant had recently had surgery R.R. Vol 5, p.121, but if Appellant was resisting it was Appellant's health at risk R.R. Vol 5, p.122.

Both officers were laying on Appellant's legs because Appellant was trying to kick them R.R. Vol 5, p.122.  She did not perform a knee strike on Appellant R.R. Vol 5, p.123. She did not tase Appellant R.R. Vol 5, p.123. Officer Firebaugh did tase Appellant one time R.R. Vol 5, p.123.  The stunning was a "drive stun" in which the prongs of the taser are removed R.R. Vol 5, p.124.  This is used for Pain Compliance R.R. Vol 5, p.124.

She never held Appellant's pepper spray R.R. Vol 5, p.124. Appellant never attempted to use pepper spray against her R.R. Vol 5, p.125.  Appellant also had a bible and a key ring with the pepper spray on it R.R. Vol 5, p.125.  She was not threatened by the Bible R.R. Vol 5, p.126.

She is aware of Fighting words R.R. Vol 5, p.127 and has training to deal with them R.R. Vol 5, p.127.

## REDIRECT R.R. Vol 5, p. 130

Appellant was being arrested for a loud noise violation R.R. Vol 5, p.131. She witnessed the commission of the noise violation R.R. Vol 5, p.131. She did not have an opportunity to speak with anyone else due to Appellant's actions R.R. Vol 5, p.132.

## RECROSS-EXAMINATION Vol 5, p. 133

Firebaugh's car was pointed in opposite direction R.R. Vol 5, p.133. Incident would have been in front of Firebaugh's car R.R. Vol 5, p.134.  She

turned on her video, the equipment didn't work R.R. Vol 5, p.137.

**JONATHAN FIREBAUGH Vol 5, p. 138**

He is a police officer with Killeen Police Department R.R. Vol 5, p.139. On September 11, 2013 we has dispatched to 1800 Stardust R.R. Vol 5, p.141. When he arrived he saw large white truck with box trailer, which he parked in front of R.R. Vol 5, p.141. He then exited his vehicle and made contact with the person who called 911 R.R. Vol 5, p.142, for a few minutes R.R. Vol 5, p.142.

Lawson (Lawson) was also present R.R. Vol 5, p.142, talking to Appellant R.R. Vol 5, p.142. Lawson was attempting to calm Appellant R.R. Vol 5, p.143. Lawson tried to calm her for a few minutes R.R. Vol 5, p.145.

Lawson then turned to approach Plumbers R.R. Vol 5, p.146. Appellant then began to ruch toward Lawson's back R.R. Vol 5, p.147. He then ran to Appellant and grabbed Appellant's left arm R.R. Vol 5, p.147. Lawson then grabbed Appellant's right arm R.R. Vol 5, p.148, and appellant jerked making a punching motion to break Lawson's grasp R.R. Vol 5, p.148.

Appellant and Lawson then fell to the ground R.R. Vol 5, p.148. He immediately followed them to the ground, voluntarily R.R. Vol 5, p.149. Appellant locked her arms under her chest and began to kick R.R. Vol 5, p.149. He positioned himself over her legs to prevent her from getting up R.R. Vol 5, p.150.The three struggled on the ground for a few minutes R.R. Vol 5, p.151.

Appellant was screaming gibberish R.R. Vol 5, p.151. He eventually got Appellant in handcuffs R.R. Vol 5, p.152.

He was driving a marked Killeen Police Department vehicle R.R. Vol 5, p.152, and was wearing his Police uniform R.R. Vol 5, p.153.

Appellant refuse to stand and had to be lifted to her feet R.R. Vol 5, p.153. Appellant was then escorted to Lawson's patrol car R.R. Vol 5, p.154. To begin she locked up and refused to move R.R. Vol 5, p.154, but eventually walked to the vehicle under her own power R.R. Vol 5, p.154.

Appellant refused to allow Lawson to search Appellant before transport R.R. Vol 5, p.155. He collected her property that was left behind after the struggle R.R. Vol 5, p.156. He identified a bible and a key ring with a pepper spray attached R.R. Vol 5, p.156.

**CROSS-EXAMINATION R.R. Vol 5, p. 157**

He has not written a supplemental response R.R. Vol 5, p.158. It did not say in the report that Appellant was kicking R.R. Vol 5, p.158. In the report he stated that he grabbed her right arm R.R. Vol 5, p.159, but that was a mistake in the report R.R. Vol 5, p.159. He turned over the keychain with the pepper spray over to Appellant's friend who was on the phone with Appellant's husband R.R. Vol 5, p.161.

When he exited his patrol vehicle, he forgot his hand mic on the charger

R.R. Vol 5, p.161. Because he forgot this, he was unable to activate the in-car camera system R.R. Vol 5, p.161. This is an unusual situation R.R. Vol 5, p.162, but in a case he testified in the day before trial a similar situation occurred as well R.R. Vol 5, p.162.

There was not defect in the Audio video system R.R. Vol 5, p.164. The incident was not recorded due to his mistake R.R. Vol 5, p.164. He received a written reprimand for failing to record the incident R.R. Vol 5, p.164.

Appellant had a book in her hands at the time of the incident R.R. Vol 5, p.167, he believes it was a bible R.R. Vol 5, p.167. He was not threatened by the bible R.R. Vol 5, p. 168. Nor was he threatened by her car keys or cell phone R.R. Vol 5, p.168.

There were a few people in the vicinity of the incident when it occurred R.R. Vol 5, p.168. One of which was the Appellant's friend R.R. Vol 5, p.168, whom he did not interview at any time R.R. Vol 5, p.169. He did not interview as the incident was witnessed by two sworn officers R.R. Vol 5, p.169.

He is unsure when he notified the State that there was no recording of the incident R.R. Vol 5, p.171. There is no mention of the failure to record the incident in the police report R.R. Vol 5, p.171. He also never mentioned in his report that he had been reprimanded for failing to record this incident in his report R.R. Vol 5, p.173. He is fair to all citizens that he encounters R.R. Vol 5, p.173.

When he stunned Appellant R.R. Vol 5, p.173, it was in drive stun mode R.R. Vol 5, p.174, and he activated the device one time R.R. Vol 5, p.174. Stunning someone causes pain R.R. Vol 5, p.174, and is called pain compliance R.R. Vol 5, p.174. IN normal mode the stun affects the whole body and may cause pain R.R. Vol 5, p.174, but drive stunning is intended to achieve compliance through pain R.R. Vol 5, p.174.

**REDIRECT R.R. Vol 5, p. 175**

Drive stunning is much less severe than being tased R.R. Vol 5, p.176.

**RECROSS-EXAMINATION R.R. Vol 5, p. 177**

Appellant might have been in pain when she fell to the ground R.R. Vol 5, p.178. People react to pain in different ways R.R. Vol 5, p.178, including kicking, yelling, whatever might be appropriate R.R. Vol 5, p.178.

He was on Appellant's left side R.R. Vol 5, p.179. He used his left knee to perform a knee strike R.R. Vol 5, p.180, while attempting to gain control of her hands R.R. Vol 5, p.180. He did not use full force because the goal was not to injure her R.R. Vol 5, p.181. It does not take much force accomplish what was needed R.R. Vol 5, p.181. It is similar to using pressure points R.R. Vol 5, p.182.

He would expect Appellant to react to falling to the ground, receiving a knee strike, and being drive stunned R.R. Vol 5, p.186.

He believes Appellant called 911 R.R. Vol 5, p.186. Appellant's friend is

standing nearby while Appellant is on the ground R.R. Vol 5, p.187.  He did not look to see if there were any marks on Appellant from the Stun R.R. Vol 5, p.188. The longer the exposure to the stun the greater likelihood of marks being left R.R. Vol 5, p.188.

## HEARING OUTSIDE THE JURY'S PRESENCE R.R. Vol 5, p.189

Objection is made to displaying Appellant's injury R.R. Vol 5, p.189. Defense requests to show Witness the mark to see if he recognizes them R.R. Vol 5, p.190. State objects as to relevance R.R. Vol 5, p.190. Court Sustains objection R.R. Vol 5, p.190.

## FURTHER DIRECT EXAMINATION R.R. Vol 5, p.191

He has previously heard one 911 call (plumber's call), but did not know if Appellant ever called 911 R.R. Vol 5, p.191.

## STATE RESTS

## THE DEFENSE'S CASE IN CHIEF R.R. VOL. 5, p. 191

## JESSIE GILLEY R.R. VOL. 5, p. 193

She is person identified before as Appellant's Friend R.R. Vol 5, p.194.  She lives at 1811 Stardust R.R. Vol 5, p.194. She was 12-15 feet away from where incident occurred R.R. Vol 5, p.195.  Appellant was talking to Lawson R.R. Vol 5, p.195, and Lawson turned to walk away R.R. Vol 5, p.195.  Firebaugh then ran over R.R. Vol 5, p.195. Firebaugh grabbed Appellant by both shoulders and threw

Appellant to the ground R.R. Vol 5, p.195. She was screaming that Appellant had just had surgery and Firebaugh shouldn't be treating her like that R.R. Vol 5, p.195.

The scene was chaotic because everyone was screaming and rude R.R. Vol 5, p.195. Names like fucking nigger, white trash were used R.R. Vol 5, p.195.

Firebaugh threw Appellant to the ground, and put his knee in the middle of Appellant's back R.R. Vol 5, p.196. She was still screaming that Appellant just had surgery R.R. Vol 5, p.196.

She witnessed Firebaugh stun Appellant R.R. Vol 5, p.196. Firebaugh was twisting the taser into Appellant's back R.R. Vol 5, p.196. She heard the taser three times R.R. Vol 5, p.197.

Appellant was shaking R.R. Vol 5, p.197, and flailing because Firebaugh was in her back R.R. Vol 5, p.197.

Appellant never struck the officers R.R. Vol 5, p.197, but her legs flailed due to the electricity R.R. Vol 5, p.197. Appellant's entire body was moving R.R. Vol 5, p.198.

There were two police cars R.R. Vol 5, p.198. No officer ever talked to her R.R. Vol 5, p.198. She was the reason they were called R.R. Vol 5, p.198.

The Plumbers flew across Cora (street) and in doing so the truck and trailer blew sparks R.R. Vol 5, p.198. Plumbers slid into a stop after crashing through her

trees R.R. Vol 5, p.198. She was outside screaming at the plumbers to slow down R.R. Vol 5, p.199. Appellant was hollering as well R.R. Vol 5, p. 199. She was louder than appellant R.R. Vol 5, p.199. Plumbers called her "white trash" R.R. Vol 5, p.199 and Appellant "black ass nigger" R.R. Vol 5, p.199.

She and Appellant were doing bible study for a number of hours prior to the incident R.R. Vol 5, p.199. She had her glasses, keys, and telephone in her hands during the incident R.R. Vol 5, p. 200. Firebaugh beat her phone on the sidewalk R.R. Vol 5, p. 200, to get it out of her hand R.R. Vol 5, p. 200. She retrieved the items from the ground after the incident R.R. Vol 5, p. 200. There was no pepper spray on the keys R.R. Vol 5, p. 201.

She was unable to record the incident because her phone was messed up R.R. Vol 5, p. 201. The police never took a statement from her R.R. Vol 5, p. 201.

**CROSS EXAMINATION R.R. Vol 5, p. 202**

She has known Appellant for seven to seven and a half years R.R. Vol 5, p. 203. Appellant and her spend a lot of time together. Appellant is her mode of transportation R.R. Vol 5, p.204.

Both she and Appellant were yelling at the Plumbers R.R. Vol 5, p. 205. She had a baby in her arms R.R. Vol 5, p. 206.

The officers arrived R.R. Vol 5, p. 207. Everyone was yelling, including the Appellant R.R. Vol 5, p. 210. Appellant's voice was raised at the officer R.R. Vol

5, p. 210.  The officer tried to calm Appellant down R.R. Vol 5, p. 210.  Appellant did not calm down R.R. Vol 5, p. 211, and was still making loud noise trying to explain herself R.R. Vol 5, p. 211.  The plumbers were calling her "f-ing nigger" while the police were present R.R. Vol 5, p. 212.

Lawson never tried to arrest Appellant R.R. Vol 5, p.212.  Firebaugh attempted to arrest Appellant first R.R. Vol 5, p. 213 and threw Appellant to the ground R.R. Vol 5, p. 213.  He then climbed onto Appellant's back R.R. Vol 5, p. 213.  Appellant was on the ground before Lawson ever attempted to take her by the arm R.R. Vol 5, p. 213.  Appellant's body was spasming R.R. Vol 5, p.213.

**REDIRECT R.R. Vol 5, p. 214**

Firebaugh was interested in Appellant's hand holding the phone and not the hand holding the bible or keys R.R. Vol 5, p. 215.  Appellant was on the phone with 911 at the time R.R. Vol 5, p. 215.  She picked up Appellant's keys after the incident R.R. Vol 5, p. 215, and there was not any pepper spray on them.

**DEFENSE RECALLS OFFICER TONYA LAWSON R.R. Vol 5, p. 217**

**JURY NOT PRESENT**

She was advised that she was under the Rule by the State's Attorney R.R. Vol 5, p.217.  During recess she was in the conference room just outside the courtroom R.R. Vol 5, p.218.  In that room was Firebaugh and the other male R.R. Vol 5, p. 218. They were talking about a different case, not Appellant's R.R. Vol 5,

p. 218.  They were speaking about a different case that has already been settled in district court R.R. Vol 5, p. 218. They were speaking about many things and she does not remember all of it R.R. Vol 5, p. 218.

**DEFENSE CALLS TABITHA MOORE R.R. Vol 5, p. 219**

**JURY NOT PRESENT**

She works for defense counsel, Michael White R.R. Vol 5, p. 219.  She was in the area just outside the conference room that the Officers were in R.R. Vol 5, p. 219.  She overheard Officer Lawson discussing how Officer Lawson was answering the Appellant's attorney R.R. Vol 5, p. 219.  Lawson said that her answers "Sure and just kept saying, Sure" R.R. Vol 5, p. 220.  Lawson was saying this in laughing manner, stating that was how she answered the questions R.R. Vol 5, p. 220.

**CROSS-EXAMINATION R.R. Vol 5, p. 220**

Officer Lawson said she was answering most of Defense's question in that manner R.R. Vol 5, p. 221. Lawson did not discuss any facts from Appellant's case that she heard R.R. Vol 5, p. 221.  Lawson was talking about "defendant's attorney" R.R. Vol 5, p. 221.  Lawson did not identify which attorney or which case R.R. Vol 5, p. 222. She did not record the conversation R.R. Vol 5, p. 222. This conversation between Lawson and Firebaugh occurred right before the last recess R.R. Vol 5, p. 222.

**REDIRECT R.R. Vol 5, p. 223**

**JURY NOT PRESENT**

Lawson identified the way she answered "defendant's attorneys" R.R. Vol 5, p. 223. Appellant's trial is only trial currently having two attorneys representing the same defendant R.R. Vol 5, p. 223.

**ARGUMENT R.R. Vol 5, p. 224**

**JURY NOT PRESENT**

Defense argues that Lawson's testimony be struck, even though there was no discussion of actual testimony. Defense argues that Lawson was discussing with State's witnesses how she dealt with defense questions and how to effectively answer them.

State argues that the Rule is designed to discourage discussion of specific details of the testimony. State argues that since no discussion of specific testimony existed, there is no call for striking Lawson's testimony.

Court Denies request to strike testimony.

**MICHELLE ELAINE GAMBLES R.R. Vol 5, p. 226**

She had gallbladder surgery July 16 R.R. Vol 5, p. 226, a few months before the incident R.R. Vol 5, p. 228.

At approximately 2:50 in the afternoon she was in a prayer service R.R. Vol 5, p. 228. She and Gilley stepped outside to watch for Gilley's grandkids to come

home R.R. Vol 5, p. 228. Gilley's grandson arrived and she saw the Plumber's truck flying down the street with sparks flying off of it R.R. Vol 5, p. 230.

She told Plumber that it was 3:30 and kids were walking home and did he realize he could kill one of the kids R.R. Vol 5, p. 230. Plumber then said "you f-ing, fucking nigger. Who you think you talking to? R.R. Vol 5, p. 231. Gilley tried to interrupt R.R. Vol 5, p. 231, and Plumber than called Gilley "white trash" R.R. Vol 5, p. 231. She then walked back across the street to borrow Gilley's phone R.R. Vol 5, p. 232. She was going to call the police, but Plumber told her he already had called R.R. Vol 5, p. 232

The police arrive, and she approaches Lawson R.R. Vol 5, p. 232. She tried to tell Lawson about how Plumbers where speeding through neighborhood R.R. Vol 5, p. 232. Her voice was really high R.R. Vol 5, p.233. She was yelling and waving her arms R.R. Vol 5, p.233, because she talks with her hands R.R. Vol 5, p.233. She did not curse or hex him R.R. Vol 5, p. 233, what she said was, "I bind you in the name of Jesus. I send it back to the depths of hell" R.R. Vol 5, p. 233. Plumber called her a witch R.R. Vol 5, p. 234. She then started to speak in tongues R.R. Vol 5, p. 233. She, Gilley and Plumber yell and argue until the Officers arrive R.R. Vol 5, p. 235.

After Lawson spoke with her, Lawson said she needed to talk with the Plumber and turned to walk over to the Plumber R.R. Vol 5, p. 235. Plumber

continued to call her "nigger" R.R. Vol 5, p.235, so she walked towards Lawson to ask if Lawson could stop him from calling her "nigger" R.R. Vol 5, p.235.

Lawson then turned and looked at her and said "you nigger" R.R. Vol 5, p. 236. She does not remember what happened in the interim, but she was then on the ground R.R. Vol 5, p.236. She has fibromyalgia R.R. Vol 5, p.236, and when it is disturbed her body starts shaking R.R. Vol 5, p. 236.

Firebaugh was the one to take her to the ground R.R. Vol 5, p. 236, Lawson did not take her down or grabbing her arm R.R. Vol 5, p.237. Lawson didn't know Firebaugh was running towards Appellant, Lawson's back was to Appellant R.R. Vol 5, p. 237. Firebaugh pushed Lawson to the ground as well R.R. Vol 5, p. 237. Firebaugh executed a knee strike on her R.R. Vol 5, p. 237.

Appellant was tased by Firebaugh R.R. Vol 5, p. 238, and still has the marks left by taser R.R. Vol 5, p. 238. Appellant was tased once, but the taser was held to her back R.R. Vol 5, p. 239. Apellant did not strike, bite, kick, or scratch the officers in any way R.R. Vol 5, p. 240.

Appellant is still in pain from the tasing and the knee strike R.R. Vol 5, p. 241. Appellant is still facing the loud noise charge in Killeen, TX R.R. Vol 5, p. 242. Appellant never intended to use force against the officers R.R. Vol 5, p. 242 nor did she at any point R.R. Vol 5, p. 242.

**CROSS EXAMINATION R.R. Vol 5, p.243**

Gilley is a good friend of Appellant R.R. Vol 5, p.243. Appellant called 911 using Gilley's phone R.R. Vol 5, p. 244. Appellant never spoke with a dispatcher R.R. Vol 5, p. 245 as the Plumber's had already called R.R. Vol 5, p. 245. Appellant is unsure if call even went through R.R. Vol 5, p. 245. Appellant believes that there should be a call from Gilley's number R.R. Vol 5, p. 246.

When Lawson arrived Appellant did not rush Lawson's patrol vehicle R.R. Vol 5, p. 247. Lawson was lying about that R.R. Vol 5, p. 249. Appellant was not yelling when Lawson arrived R.R. Vol 5, p.248. Lawson was also not trying to calm Appellant down, as Lawson testified R.R. Vol 5, p.248. Appellant wanted to speak with Lawson R.R. Vol 5, p. 248, but Lawson did not want to talk to Appellant R.R. Vol 5, p.248. Lawson then called her the name R.R. Vol 5, p.249.

Lawson did not attempt to grab Appellant's arm until Appellant was on the ground R.R. Vol 5, p. 250. Appellant did not jerk her arm away from Lawson R.R. Vol 5, p. 251.

Appellant knows Sheena Mendez is her neighbor, but does not know her R.R. Vol 5, p.255, there has not been any previous incidents between the two R.R. Vol 5, p.255. Appellant does not know Koenig, Lawson, Firebaugh, or Young prior to the occasion in question R.R. Vol 5, p. 256.

**REDIRECT EXAMINATION R.R. Vol 5, p. 258**

Appellant was carrying her glasses, bible and keys at the time of the incident R.R. Vol 5, p. 258. Appellant does not have any sort of mace or pepper spray attached to her keys R.R. Vol 5, p. 258. Appellant used to have mace on her keys but removed them before the incident R.R. Vol 5, p. 258. Appellant did not try to strike the officers with her bible R.R. Vol 5, p. 259.

**DEFENSE RESTS**

**STATE RECALLS TONYA LAWSON R.R. Vol 5, p. 260**

Lawson did not hear Young call Appellant the "N" word R.R. Vol 5, p. 260. Lawson did not hear anyone at the scene use that word R.R. Vol 5, p. 260. Lawson did not call Appellant that word R.R. Vol 5, p. 260.


**STATE RECALLS SHEENA MENDEZ R.R. Vol 6, p. 6**

She is familiar with the racial slur sometimes referred to as the "N" word R.R. Vol 6, p. 6. She did not hear the plumbers use the "N" word R.R. Vol 6, p. 7. She did not hear the officers ever use that word R.R. Vol 6, p. 7. No one used that word during the incident R.R. Vol 6, p. 8. Such an occurrence would have shocked her, and made an impression on her R.R. Vol 6, p. 8.

**CROSS-EXAMINATION R.R. Vol 6, p. 8**

She arrived after the incident began R.R. Vol 6, p. 8. She was present prior to the officers arriving R.R. Vol 6, p. 11. She did not know what happened

between the plumbers and Appellant prior to her arrival R.R. Vol 6, p. 11. She does not know what was said prior to her arrival, but after she arrived that word was not used R.R. Vol 6, p. 12.

The Plumbers did call her a "witch" R.R. Vol 6, p. 12, as well as calling her a "short, black female" R.R. Vol 6, p. 12. Plumbers also called her "African American" more than once R.R. Vol 6, p. 12. She does not know how long prior to her arrival the incident had been occurring R.R. Vol 6, p. 12. She did go inside the residence for a period of time, but believes that she could have heard if the conversation continued R.R. Vol 6, p. 13.

When she came back outside Firebaugh was discussing with Plumbers and Lawson was speaking to Appellant R.R. Vol 6, p.13. Appellant and Gilley were closer to Lawson than she was R.R. Vol 6, p.14.

**STATE CALLS AUBREY HUCKABY R.R. Vol 6, p. 15**

She is the training supervisor for the Bell County Communication Center R.R. Vol 6, p. 16, which is the 911 center for Bell County R.R. Vol 6, p. 16. The Center covers the City of Killeen R.R. Vol 6, p. 16. She reviewed all 911 calls made on September 11, 2013 R.R. Vol 6, p.16. She was only able to find the Plumber's phone call for this address in the system R.R. Vol 6, p. 17. She examined the system for Gilley's phone number R.R. Vol 6, p.17, but there was no record of that number calling on that date R.R. Vol 6, p. 18. Calls are recorded

before the operator is able to answer R.R. Vol 6, p.18.

**CROSS-EXAMINATION R.R. Vol 6, p.19**

The system does not document calls that are made but not received R.R. Vol 6, p. 20. The system does not document any attempted calls or interrupted calls R.R. Vol 6, p.21

**DEFENSE REBUTTAL- RECALLS JESSIE GILLEY R.R. Vol 6, p. 21**

She was present when Appellant was doing things with her phone R.R. Vol 6, p. 22. Appellant was on the phone with 911 R.R. Vol 6, p. 22 or so Gilley thought R.R. Vol 6, p.22. The officer was beating her phone on the ground to get it out of Appellant's hand and Gilley retrieved her phone from Appellant's hand R.R. Vol 6, p.23. She thought she heard a conversation between Appellant and 911 dispatcher R.R. Vol 6, p. 23. When she retrieved the phone she hung up and called Appellant's husband R.R. Vol 6, p. 23.

She heard the Plumber call Appellant "nigger" R.R. Vol 6, p. 24, and also heard Lawson call appellant that same word R.R. Vol 6, p.24.

**STATE CLOSED R.R. Vol 6, p. 27**

**DEFENSE CLOSED R.R. Vol 6, p. 27**

**THE COURT'S CHARGE CONFERENCE R.R. Vol 6, p. 28**

Defense requests change to charge that a phrase be removed R.R. Vol 6, p. 28 as well as reversing the findings on the verdict form to show not guilty first

R.R. Vol 6, p. 29.  State agreed to requested changes.

**JURY NOTE R.R. Vol 6, p.  66**

The jury sent out a note that said, "Would we be able to see a book with a longer description of resisting arrest?" the court responded with "The court cannot give any further definitions. Please refer to the Court's charge" R.R. Vol 7, p.68

The jury sent out a second note that said "Does the force referred to in the statute express aggressive or passive or either?" R.R. Vol 7, p.68. The court again responded with "The court cannot give any further definitions. Please refer to the Court's charge" R.R. Vol 7, p.

**JURY VERDICT R.R. Vol 6, p. 70**

The jury found the Appellant guilty of Resisting Arrest or search or transport R.R. Vol 6, p.71.

**Volume 7 of 9**

**HEARING ON PUNISHEMNT**

The court called the case and both sides announced ready R.R. Vol 7, p. 4. State reoffered all the evidence previously admitted during guilt/innocence phase of the trial and then rested, Court responded "very well". R.R. Vol 7, p. 6.

**DEFENDANT'S CASE IN CHIEF ON PUNISHMENT R.R. Vol 7, p. 7**

**CHRISTOPHER GAMBLES R.R. Vol 7, p. 7**

He is Appellant's husband R.R. Vol 7, p. 7. They have 2 Biological Children

and 20 other children that call Appellant "mom" R.R. Vol 7, p. 11. Appellant often goes to pray for or with a large number of people R.R. Vol 7, p. 11. She is not paid for her prayer support R.R. Vol 7, p. 12.

Restricting Appellant with probation would be an injustice to a number of people R.R. Vol 7, p. 14. Appellant would obey whatever restrictions were placed on Appellant R.R. Vol 7, p. 15. Appellant has lesions on her liver R.R. Vol 7, p. 16.

**CROSS-EXAMINATION R.R. Vol 7, p. 22**

Appellant was charged with resisting arrest in the mid 1990's R.R. Vol 7, p. 24, but the charge was reduced to disorderly conduct R.R. Vol 7, p. 26.

**STAE AND DEFENSE REST AND CLOSE ON PUNISHMENT R.R. Vol 7, p. 39**

**THE COURT'S CHARGE CONFERENCE R.R. Vol 7, p. 39**

No objection to the Court's charge R.R. Vol 7, p.40. The court added a statement about self-incrimination, as Appellant did not testify during the Punishment phase of trial R.R. Vol 7, p. 43.

**JURY VERDICT R.R. Vol 7, p. 58**

The jury verdict for the offense of Resisting Arrest or Transport is confinement for 6 days in the county jail and a fine in the amount of zero dollars. R.R. Vol 7, p. 58. The jury does not recommend the suspension of the sentence

R.R. Vol 7, p. 59.

**MOTION FOR JAIL CREDIT R.R. Vol 7, p. 62**

The Defense moves that Appellant be given credit for 6 days in jail, leaving her time served in this matter R.R. Vol 7, p. 62. The court sees that Appellant has only served one day in county jail R.R. Vol 7, p. 62. Court gives credit for the one calander day that the Appellant served with whatever "good time credit" the Sherriff's office calculates as is customary in Bell County R.R. Vol 7, p. 63.

## POINT OF ERROR NUMBER ONE

The evidence is legally insufficient to support the Jury Verdict of Guilt as the State failed to establish that the Appellant intentionally used force against a peace officer or another as required by law.

## ARGUMENT AND AUTHORITIES
## ON POINT OF ERROR NUMBER ONE

The evidence was insufficient to support the verdict of guilty because the State failed to establish that the Appellant used force against the peace officers. Appellant was convicted under section 38.03 of the Texas Penal Code. This section begins in subsection (a) stating "A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another by using force against the peace officer or another" TEX PENAL CODE ANN. §38.03(a). The statute then states that "It is no defense to prosecution under this section that the arrest or search was unlawful" TEX PENAL CODE ANN. §38.03(b). and that this offence, when not committed using a deadly weapon is a class A misdemeanor ,see TEX PENAL CODE ANN. §38.03 (c) and (d). Appellant argues that she was only passively resistant and did not intentionally use any force or violence toward the arresting officers.

The standard of review for evidentiary sufficiency challenges can be found

in Jackson v. Virginia, 443 U.S. 307, 318–19, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Brooks v. State, 323 S.W.3d 893, 902 (Tex.Crim.App.2010); Clayton v. State, 235 S.W.3d 772, 778 (Tex.Crim.App.2007). The sufficiency of the evidence is measured against the elements of the offense as defined by the hypothetically correct jury charge for the case. Gharbi v. State, 131 S.W.3d 481, 482–83 (Tex.Crim.App.2003); Gollihar v. State, 46 S.W.3d 243, 254 (Tex.Crim.App.2001); Malik v. State, 953 S.W.2d 234, 236–40 (Tex.Crim.App.1997). A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. Malik, 953 S.W.2d at 237. See also TEX.CODE CRIM. PROC. ANN. art. 36.14 (West 2012); Gray v. State, 152 S.W.3d 125, 127–28 (Tex.Crim.App.2004) (trial court's charge to the jury must set forth the "law applicable to the case").

Appellant cites Sheehan v. State, 201 S.W.3d 820, 823 (Tex. App.—Waco 2006, no pet.), to support her Position that the State's proof was insufficient. There, the court said,

> The Penal Code does not provide a definition of "using force against" or of those terms individually.   Courts have concluded that non-cooperation with an arrest is not an act of "use of force against" a peace officer under the resisting arrest statute, for example:

- shaking off an arresting officer's detaining grip. Anderson v. State, 707 S.W.2d 267, 269 (Tex.App.-Houston [1st Dist.] 1986, no pet.).

- pulling away from an arresting officer after being arrested. Young v. State, 622 S.W.2d 99, 100-01 (Tex.Crim.App. [Panel Op.] 1981).

Thus, refusing to cooperate with being arrested does not constitute resisting arrest by force.

The court in *Sheehan* goes on to state, "Courts have made the distinction between actions that endanger an officer ((i.e. striking an arresting officer's arm) and those actions in which there is no danger of injury to the officer (i.e. pulling arm away from officer). See Raymond v. State, 640 S.W.2d 678, 679 (Tex.App.-El Paso 1982, pet. ref'd)." (Id.)

The Courts have also stated, "[E]vidence of non-cooperation combined with violent swings of the body and a forward movement causing the officer and the defendant to fall off a porch was sufficient to establish resisting arrest." Bryant v. State, 923 S.W.2d 199, 206 (Tex.App.-Waco 1996, pet ref'd). This is important as the court is describing the lower boundary, or the minimum action when non-cooperation plus some substantial additional force is enough to support a conviction for resisting arrest.

In this case, the evidence clearly shows that there was little to danger of injury to the officers from Appellant's passive non-cooperation, and no evidence that Appellant used force against the officers. In fact, after a close reading of the record shows that every witness testified that Appellant did not intend to strike the

officers nor did she in fact strike them, intentionally or unintentionally. Officer Lawson testified that Appellant was kicking her legs, not at Officer Lawson, but just in general R.R. Vol 5, p. 75, and did not actually kick Lawson.

As stated, it has been held that non-cooperation combined with violent swings of the body and forward movement causing the officer and defendant to fall off a porch is what we need to establish Resisting arrest. In the instant case, Appellant and Officer Lawson did indeed fall to the ground. But there is no evidence that Appellant's actions caused Lawson to go to the ground. The record is conflicting, but it appears that both Officers Lawson and Firebaugh grabbed Appellants arms R.R. Vol 5, p. 68, and Appellant jerked her arm away from Officer Lawson to break her grasp R.R. Vol 5, p. 69. Lawson then fell to the ground and pulled Appellant with her R.R. Vol 5, p. 70. Firebaugh then voluntarily went to the ground after Lawson and Appellant R.R. Vol 5, p. 149. This is the only action by the Appellant submitted into evidence that even approaches sufficient force to establish Resisting Arrest, and it is clearly not enough.

As stated above, in R*aymond* and *Sheehan*, the courts have made the distinction between actions that endanger an officer and those in which there is no danger of injury to the officer. Appellant argues that her passive non-cooperation, in this case jerking her arm away from Officer Lawson, that may or may not have cause Lawson to fall to the ground (there is no evidence as to why Officer Lawson

fell to the ground), in no way raises to the level that endangered the officer. *Sheehan* cites *Anderson v. State*, 707 S.W.2d 267, 269 (Tex.App.-Houston [1st Dist.] 1986, no pet.) which specifically says that the action that Appellant took, shaking off an officer's grip does not establish a "use of force" against that officer.

Clearly, there is some finite amount of danger in all actions. Appellant could have stood motionless and either officer could have tripped when approaching her, ending in the same outcome as this incident. The statute states that the force used must be "intentional". Appellant clearly intended to break the Officer's grasp. But the Defendant in *Anderson* (id.) intended to break the officer's grasp as well. Appellant argues that the action must have been intended to endanger the officer. And in this case, the State needed to prove beyond a reasonable doubt that Appellant intended to endanger the arresting Officers, which it clearly failed to do.

Once all of the evidence is considered in the light most favorable to the verdict, a rational trier of fact could not have found, beyond a reasonable doubt, all of the elements of the alleged violation of section 38.03. We, of course, would have a better idea of what actually transpired, had Officers Lawson and Firebaugh followed policy and made any sort of audio/visual recording of the incident, but given the evidence presented, the evidence cannot be held to support Appellant's conviction for Resisting Arrest in under Texas Penal Code Section 38.03.

## CONCLUSION

In conclusion, the evidence is insufficient to support the Jury's verdict of Guilt. Accordingly, the case should be reversed and a Verdict of Not Guilty should be entered.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Michelle Elaine Gambles, Appellant prays this Honorable Court reverse the judgment of conviction for Resisting Arrest and, rendered or in the alternative reversed and remanded for a new trial. The Appellant also Prays for any other relief that she may be entitled.

/S/ Bobby Dale Barina
BOBBY DALE BARINA
State Bar No. 01738480
Tyler Woudwyk
State Bar No. 24084120
455 East Central Texas Expressway, Suite 104
Harker Heights, Texas 76548
(254) 699-3755
(254) 699-1074
Email: bobbydalebarina@barinalaw.com

MICHAEL FLOYD WHITE
State Bar No. 00785231
100 Kasberg Drive, Suite A
Temple, Texas 76502
Email: lawyer@vvm.com
Attorneys for Appellant

## CERTIFICATE OF SERVICE

This is to certify that a copy of the above entitled and numbered brief has been served on the Bell County Attorney's Office, Texas, by delivery of a true copy to them, by depositing the same, postpaid, in an official depository under the care and custody of the United States Postal Service on the 16th, day of August, 2015, properly addressed to James Nichols County Attorney, P.O. Box 1127, Belton, Texas, 76513.

/S/ Bobby Dale Barina
BOBBY DALE BARINA

## CERTIFICATE OF SERVICE

This is to certify that a copy of the above entitled and numbered brief has been served on Michelle Elaine Gambles, Appellant, by delivery of a true copy to her, by depositing the same, postpaid, in an official depository under the care and custody of the United States Postal Service on the 16th day of August, 2015.

/S/ Bobby Dale Barina
BOBBY DALE BARINA

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to Rule of Appellate Procedure 9.4(i)(3), that this computer-generated brief contains 10,134 words. The software is Microsoft Word 2013.

/S/ Bobby Dale Barina
BOBBY DALE BARINA